836 F.2d 433
 NATIONAL CORPORATION FOR HOUSING PARTNERSHIP, federal equity
receiver of the Cedar Square West Housing Project on
appointment by The Honorable Robert G. Renner, U.S. District
Court Judge, in Civil Files 3-84-1097 and 3-85-421, Appellee,
v.
LIBERTY STATE BANK, Stage I Land Company, F Building Land
Company and Keith Heller, Appellants.
 Nos. 87-5095, 87-5096.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 2, 1987.
Decided Jan. 7, 1988.
 
 Eric J. Magnuson, Minneapolis, Minn., for appellee.
 Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 National Corporation for Housing Partnership brought this suit as receiver for the Cedar Square West Housing Project to recover security deposits belonging to the housing project tenants. The security deposits had been commingled with the project's operating funds by the Cedar Square West owners, Stage I and F Building Land Company, and general partner of their general partner, Keith Heller (these three parties will be referred to collectively as the "Cedar Square West appellants"). A portion of these funds was used to purchase certificates of deposit, which Stage I had pledged to Liberty State Bank to secure a loan and which Liberty had applied to pay off the loan. The district court[1] entered summary judgment against Liberty State Bank on the grounds that Stage I did not own the deposits and therefore could not grant Liberty a security interest in them. The court granted summary judgment against the Cedar Square West appellants on the issue of liability for Cedar Square West's security deposit funding. The court entered its final judgment after a trial on the amount of the Cedar Square West appellants' damage liability. We affirm.
 
 
 2
 Stage I, a Minnesota limited partnership, and F Building, a partnership, owned a housing project for which they had obtained government-insured financing under the National Housing Act. Cedar Riverside Associates, Inc. and Cedar Riverside Properties, a Minnesota limited partnership, are the general partners in both Stage I and F Building. Keith Heller, in turn, is president of Cedar Riverside Associates, Inc. and general partner of Cedar-Riverside Properties. In order to get the financing, Stage I and F Building had entered into regulatory agreements with the Secretary of Housing and Urban Development governing their operation of the financed properties. The regulatory agreements contained provisions governing the owners' treatment of tenants' security deposits,[2] under which the owners agreed to keep the security deposits in a separate trust account, the amount of which equalled or exceeded the owners' outstanding obligations for return of security deposits to tenants.
 
 
 3
 The project was located in Minnesota, which regulates residential rental security deposits by statute. Minn.Stat. Sec. 504.20(2) (1986).[3]
 
 
 4
 The Cedar Square West appellants collected security deposits from their tenants and established bank accounts representing the security deposits. The actual security deposits were not segregated from the owners' other funds, and the moneys in the security deposit accounts could not be traced directly from the tenants to the security deposit account.
 
 
 5
 On August 3, 1981 Heller wrote to Liberty Board Chairman David Fesler, indicating that there were funds for security deposits in interest-bearing accounts, which the Board of Directors of the Cedar-Riverside Associates, Inc. might decide to deposit with Liberty. In October, 1981 the security deposit accounts were moved to Liberty and invested in CD's. Fesler admitted that he had always known the funds represented "security deposit funding", but disputes only whether he knew they represented tenants ' security deposits. Fesler was a limited partner in Cedar-Riverside Properties, and, of course, was aware that the Cedar-Riverside group was engaged in the business of renting apartments.
 
 
 6
 In August, 1982 Stage I borrowed the amount of the CD's from Liberty and pledged the CD's as security for the debt. The CD's were reinvested several times and finally consolidated into one certificate.
 
 
 7
 The Cedar Square West project was placed in receivership upon the application of the United States. After the receiver was appointed, Liberty applied most of the CD proceeds to Stage I's defaulted loan and turned over to the receiver only $5,587.82, the amount left over.
 
 
 8
 The receiver brought this suit to recover the tenants' deposits. The district court granted the receiver's summary judgment motion against Liberty, reasoning that under the Minnesota statute, a landlord receives residential security deposits as a bailment. Having no interest in the fund other than that of a bailee, Stage I did not have sufficient rights in the CD's to grant a security interest in them. Accordingly, Liberty's claimed security interest was invalid. The court entered summary judgment against Liberty for the amount of the CD proceeds Liberty retained to pay off the loan.
 
 
 9
 The court granted partial summary judgment against the Cedar Square West appellants on the issue of liability for the amount of the project's security deposit liability. After a trial on the issue of damages, the court entered judgment against the three for $340,107.18 plus prejudgment interest.
 
 
 10
 On appeal, Liberty argues that the security deposits were not a bailment, but a debt, and that at any rate, the proceeds of CD's were not the tenants' money, since they could not be traced from the tenants to the security deposit account.
 
 
 11
 The nature of the security deposits is governed by Minnesota law. This court accords substantial deference to the district court's interpretation of state law, particularly "when considering a state statute not yet construed by the state court." G.A. Imports, Inc. v. Subaru Mid-America, Inc., 799 F.2d 1200, 1205 (8th Cir.1986).
 
 
 12
 There is no Minnesota case determining whether the provisions of Minn.Stat. Sec. 504.20(2) create a debt or a bailment. The district court concluded that the statutory language providing that the security deposits "shall be held by the landlord for the tenant " (emphasis added by the district court) created a bailment, that is, the " 'legal relation arising upon delivery of goods without transference of ownership under an express or implied agreement that the goods be returned' or accounted for." Slip Op. at 9 (quoting Wallinga v. Johnson, 269 Minn. 436, 131 N.W.2d 216, 218 (1964)). The district court found further support for its conclusion in the regulatory agreements which required the segregation of the security deposit funds in a separate trust account and which forbade the transfer or encumbrance of the funds without prior written approval. This reinforced the district court's conclusion that Stage I had no interest in the CD and that Liberty consequently obtained no security interest.
 
 
 13
 Liberty cites a number of cases from other jurisdictions holding that a security deposit creates a debtor-creditor relation at common law, with the landlord taking title to the moneys[4]; but no matter how the relation might be characterized at common law, the Minnesota statute supercedes any contrary common law.
 
 
 14
 Liberty also argues that unless the landlord is obligated to return to the tenant the identical check or moneys the tenant deposited, the relation cannot be one of bailment. While such appears to have been the ancient rule regarding bailment of money, see, e.g., Wright v. Payne, 62 Ala. 340, 344 (1878), the rule requiring return of the identical item has been liberalized in the case of bailment of fungible goods. See generally R. Brown, The Law of Personal Property Sec. 10.6 (3d ed. W. Raushenbush rev. 1975). Cf. Production Credit Association v. Fitzpatrick, 385 N.W.2d 410 (Minn.Ct.App.1986) (person storing another's grain in his bin is bailee). At least one jurisdiction has also liberalized the rule in the case of money, analogizing to the case of fungible goods. Knapp v. Knapp, 118 Mo.App. 685, 96 S.W. 295, 297 (1906). In the absence of Minnesota authority on point and in light of our deference to the district court on undecided questions of state law, we cannot say the district court erred in determining that Stage I held the security deposits without transfer of ownership under express or implied agreement that they be returned or accounted for, and that such was a bailment under Minnesota law. We believe that, while all of the attributes of bailment may not be strictly applicable to such deposits, the district court did not err in its conclusion with respect to the essence of the relationship.
 
 
 15
 Next Liberty argues that the CD cannot be treated as bailed property because it was not purchased exclusively with the actual tenants' deposits, but with money from a general operating fund. Liberty cites In re Trafalgar Associates, 53 B.R. 693 (Bankr.S.D.N.Y.1985), for the proposition that in order to charge a fund as security deposits, the deposits must be traced from the tenant's hand to the fund. The Trafalgar case is inapplicable, since it was decided under New York's statutory provisions making security deposits trusts and therefore subject to trust tracing rules. Minn.Stat. Sec. 504.20(2) specifically provides that the security deposits will not be received by the landlord in a fiduciary capacity and the parties agree that trust law does not apply in determining Liberty's rights and duties regarding the CD's.
 
 
 16
 We have already concluded that it was not necessary for Stage I to undertake to keep and return the identical moneys rendered by the tenants in order for the security deposits to be treated as a bailed property. Stage I does not dispute that the CD was purchased with money set aside to cover Stage I's security deposit liability. Since Liberty's chairman Fesler admitted that he knew the CD represented "security deposit funding", it is immaterial that the CD may not have been purchased exclusively with the same dollars derived from the tenants' deposits.
 
 
 17
 We conclude that the district court did not err in its determination that the CD was bailed property. Since Liberty concedes that "when there is a 'true bailment' the interests of a bailee are not sufficient to support the attachment of a security interest" in the bailed property, the district court's entry of summary judgment against Liberty was appropriate.[5]
 
 
 18
 The Cedar Square West appellants argue that the trial court erred in holding them liable for misuse of the security deposits because, although Heller admits the security deposits were not kept in a separate account as required by the Regulatory Agreement, Heller testified that he deposited the proceeds of the Liberty loan into a general operating account of the Cedar Square West project. Therefore, the Cedar Square West appellants argue that the project did not lose the money and there were no damages.
 
 
 19
 The district court held Stage I and F Building liable for breach of the Regulatory Agreements and held Heller liable as general partner of Stage I and F Building. The Regulatory Agreements provided for personal liability of Stage I and F Building "for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof." The Agreements expressly required that tenant security deposits be kept in a segregated trust account, which Heller admits he did not do. As a result of this failure, the receiver had no trust fund from which to pay Cedar Square West's obligations to its tenants. Therefore, the district court correctly ruled that both liability and the fact of damages are clear.
 
 
 20
 The Cedar Square West appellants also argue that the receiver did not prove the amount of damages with the requisite degree of certainty. Under Minnesota law, though an award of damages cannot be speculative or conjectural "an award of damages will not be denied merely because of difficulty in ascertaining them, and absolute certainty is not required." Henning Nelson Construction Co. v. Fireman's Fund American Life Insurance Co., 383 N.W.2d 645, 653 (Minn.1986). Furthermore, "[t]here is no general test for speculative or conjectural damages; such matters should usually be left to the judgment of the trial court." Id.
 
 
 21
 The receiver proved the amount of the project's security deposit liability as of November, 1984 (when receivership began) by two methods. First, it introduced Board reports prepared and promulgated at Heller's direction showing security deposit liabilities of $345,695.00 for the project as of October 26, 1984. Next, the receiver's accountant produced a security deposit listing as of July, 1984 and added the amount of interest that would have accrued on those deposits up to October, 1984, arriving at an amount of $335,079.98. Then, the receiver adduced testimony that additional parking ramp card deposits of at least $10,000 would be included in the total security deposit liability. The property manager for the project testified that occupancy in the project varies cyclically, with lowest occupancy occurring in the summer and highest in the months of the school year, leading to the inference that the July figures would be a conservative estimate of liability for November. Based on the two calculations presented by the receiver, the district court arrived at a total security deposit liability figure of $345,695.00 and reduced that figure by $5,587.82, the amount of the CD proceeds which Liberty returned to the receiver after paying off its loan to Stage I.
 
 
 22
 The Cedar Square West appellants argue that the receiver should not have been allowed to extrapolate from the July figures to prove November liability, and that the evidence indicated the figures from the Board packet were not reliable.
 
 
 23
 The evidence indicated that the extrapolation from the July figures was reasonably accurate (and probably conservative). At any rate, the receiver's accountant testified that the reason October figures were not readily available was the lack of records kept by the Cedar Square West appellants. The district court was well within its discretion in refusing to hold the receiver to an extreme degree of certainty rendered doubly difficult by the appellants themselves. See id. The court was also within its discretion in determining that the Board reports corroborated by the receiver's calculations were adequately accurate. See id.
 
 
 24
 The judgment of the district court is affirmed as to all appellants.
 
 
 
 [1]
 The Honorable Robert G. Renner, United States District Judge for the District of Minnesota
 
 
 [2]
 The regulatory agreements provided that the owners could not (without prior written permission):
 (g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first months' rent plus a security deposit not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account, the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.
 
 
 [3]
 Minn.Stat. Sec. 504.20(2) provides in relevant part:
 Subd. 2. Any deposit of money shall not be considered received in a fiduciary capacity within the meaning of section 82.17, subdivision 7, but shall be held by the landlord for the tenant who is party to the agreement and shall bear simple interest at the rate of 5- 1/2 percent per annum noncompounded....
 Subd. 3. Every landlord shall, within three weeks after termination of the tenancy and receipt of the tenant's mailing address or delivery instructions, return the deposit to the tenant, with interest thereon as above provided, or furnish to the tenant a written statement showing the specific reason for the withholding of the deposit or any portion thereof
 ....
 Subd. 4. Any landlord who fails to provide a written statement within three weeks of termination of the tenancy and receipt of the tenant's mailing address or delivery instructions, as required in subdivision 3, shall be liable to the tenant for damages in an amount equal to the portion of the deposit withheld by the landlord and interest thereon as provided in subdivision 2, as a penalty, in addition to the portion of the deposit wrongfully withheld by the landlord and interest thereon.
 * * *
 Subd. 6. Upon termination of the landlord's interest in the premises, whether by sale, assignment, death, appointment of receiver or otherwise, the landlord's successor in interest shall have all of the rights and obligations of the landlord with respect to such deposit....
 
 
 [4]
 Mendelson-Silverman, Inc. v. Malco Trading Corp., 146 Misc. 215, 260 N.Y.S. 881, 882 (Sup.Ct.1932), aff'd, 238 App.Div. 852, 262 N.Y. 991 (1933), aff'd, 262 N.Y. 621, 188 N.E. 92 (1933); United States v. Samel Refining Corp., 461 F.2d 941, 943 (3d Cir.1972); Povey v. Colonial Beacon Oil Co., 294 Mass. 86, 200 N.E. 891 (1936). Other jurisdictions characterize security deposits as bailments at common law. See, e.g., Rasmussen v. Helen Realty Co., 92 Ind.App. 278, 168 N.E. 717, 721 (1929) (en banc); see 3A G. Thompson, Commentaries on the Modern Law of Real Property 429 (1981 ed. J. Grimes rev.)
 
 
 [5]
 Liberty also argues for the first time on appeal that it is entitled to summary judgment. First, Liberty argues that it is entitled to summary judgment as the holder of a non-negotiable instrument under Minn.Stat. Sec. 336.3-805 (1986). Since Liberty did not move for summary judgment or otherwise raise this issue in the trial court, we will not consider it for the first time on appeal. Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); Spear v. Dayton's, 771 F.2d 1140, 1144 (8th Cir.1985)
 Liberty also argues that it is entitled to summary judgment as the party with a prior security interest under Article Nine of the Uniform Commercial Code. This argument is, of course, concluded by our earlier decision that Liberty obtained no security interest at all.