VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVS., LLC

[212 N.C. App. 400 (2011)]

Order denying Defendant's Motion and Request for Dismissal is vacated and we remand for a new hearing on the Motion.

Vacated and remanded.

Judges STEELMAN and STEPHENS concur.

——————————

VARIETY WHOLESALERS, INC., Plaintiff v. SALEM LOGISTICS TRAFFIC SERVICES, LLC, SALEM LOGISTICS, INC., SALEM LOGISTICS TRANSPORT SERVICES, LLC, WINSTON TRANSPORTATION MANAGEMENT, LLC, OVERBROOK LEASING, LLC, SALEM LOGISTICS TRANSPORT FINANCE, LLC, DAVID F. ESHELMAN and ARK ROYAL CAPITAL, LLC, Defendants

No. COA10-1285

(Filed 7 June 2011)

**1. Fraud— constructive fraud—no fiduciary or confidential relationship**

The trial court did not err by granting summary judgment in favor of defendant Ark on a constructive fraud claim. There was no evidence to warrant the existence of a fiduciary or confidential relationship between the parties.

**2. Conversion— contested funds—no ownership interest**

The trial court erred by granting summary judgment in favor of plaintiff on a conversion claim. Plaintiff did not retain an ownership interest in the contested funds.

Appeal by Ark Royal Capital, LLC, from order entered 19 April 2010 and an amended order entered 12 May 2010, and cross-appeal by Variety Wholesalers, Inc., from order entered 19 April 2010, by Judge Howard E. Manning, Jr., in Vance County Superior Court. Heard in the Court of Appeals 11 May 2011.

*Wyrick Robbins Yates & Ponton, LLP, by K. Edward Greene, Tobias S. Hampson, Paul J. Puryear, Jr., and Grady L. Shields, for plaintiff cross-appellant-appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jim W. Phillips, Jr., and Alexander Elkan, for Ark Royal Capital, LLC, defendant appellant-appellee.*

VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVS., LLC

[212 N.C. App. 400 (2011)]

*Bell, Davis & Pitt, P.A., by William K. Davis and Alan M. Ruley for North Carolina Bankers Association amicus curiae.*

McCULLOUGH, Judge.

Variety Wholesalers, Inc. ("Variety") filed its initial Complaint against Salem Logistics Traffic Services, LLC ("Salem") on 6 January 2009 seeking compensatory and punitive damages. Variety raised claims of breach of contract, conversion, larceny, fraud, false pretenses, and unfair and deceptive trade practices related to Salem's failure to perform pursuant to its contract and its conversion of funds intended for Variety's carriers. In attempting to attach Salem's bank account, Variety learned that Ark Royal Capital, LLC ("Ark") was the actual owner of the account and filed an Amended Complaint on 17 April 2009 to add Ark as a codefendant for conversion and constructive trust. Variety and Ark both filed motions for summary judgment based on the claims. Ark appeals the granting of Variety's motion for summary judgment on the conversion claim. Variety cross-appeals the trial court's granting of summary judgment in favor of Ark in dismissing Variety's constructive trust claim.

## I. Background

Variety is a privately held company out of Henderson, North Carolina, that owns and operates more than four hundred retail stores in fourteen states. It also has extensive shipping and trucking operations. Salem, out of Winston-Salem, North Carolina, was a group of related businesses that provided a range of transportation services, including audit services. Salem has since dissolved and its former owner has filed for bankruptcy. Ark, based in Houston, Texas, is in the business of making asset-backed loans to domestic corporations and is a senior secured lender to Salem.

Variety and Salem entered into a Freight Services Agreement ("Freight Agreement") in July 2007 in which Salem would provide Variety with freight bill audit services. The Freight Agreement provided that various motor carriers for Variety would submit bills for services to Salem, Salem would audit the bills, present valid bills to Variety, receive funds from Variety for the bills, and pay the carrier. Variety would deposit the funds in Salem's Wachovia account, which unbeknownst to Variety was actually owned by Ark. The Freight Agreement contained a Schedule A, explaining the process by which Salem would perform its services, and a Schedule B, laying out the fee arrangement in which Salem would receive $0.18 to $0.68 per

transaction for freight billing and payment services. Schedule A stipulated that Salem would "immediately distribute" monies to the proper carrier.

Prior to the making of the Freight Agreement, in March 2006 Salem entered into an Accounts Receivable Finance Agreement with Ark, in which Ark would extend a revolving line of credit to Salem. The parties updated the prior agreement and entered a First Amended and Restated Accounts Receivable Finance Agreement ("Finance Agreement") on 7 March 2008. Pursuant to the Finance Agreement, Ark extended credit not to exceed the lesser of $2.2 million or 80% of Salem's "Eligible Accounts." An Eligible Account is defined in the Finance Agreement as a "valid, legally enforceable obligation" owed to Salem that "is not subject to any claim, dispute or other defense." As collateral, Salem granted Ark a first lien in all of its assets, including accounts receivable. Ark set up a "lockbox" and corresponding Wachovia account, and Ark was authorized to receive all funds sent to either.

On a weekly basis Salem sent Ark a list of outstanding accounts receivable and a schedule of payments received on such accounts to calculate the amount Ark would advance on the line of credit. Salem would indicate whether or not a particular account was an Eligible Account and warranted that Ark could rely on its representations. Ark's Chief Operating Officer, Allison Hanslik, along with David Pearson, an Ark Research Analyst, would review Salem's accounts and the provided summary. Neither Hanslik nor Pearson ever took issue with the summaries submitted by Salem.

Salem directed all of its customers to send all payments due to Salem directly to the Wachovia account. Salem and Variety did not stipulate in the Freight Agreement that Salem was required to keep the funds paid by Variety for payment to carriers in a separate account. As a result, Variety deposited the funds in the Wachovia account, not knowing of Ark's ownership of the account. Salem, from the beginning, had a hard time paying Variety's carriers in a timely manner. Variety raised the issue and Salem committed that it was in the process of fixing the problem.

Between September and December 2008, Variety claims it forwarded somewhere in excess of $700,000 to Salem, which Salem failed to forward to the carriers. During the same period, Salem received other large sums of money in the Wachovia account. Ark relied on this paydown of Salem's debt, along with Salem's represen-

tations as to Eligible Accounts, to advance an equally large sum of money to Salem during that time. In January 2009, Ark declared Salem in default of the Finance Agreement and as a result claimed a loss of around $1.8 million.

Upon determining that Ark was the actual owner of the Wachovia account, Variety amended its complaint against Salem to include Ark on the basis of common law conversion and constructive trust. The trial court granted summary judgment for Variety on the conversion claim and summary judgment for Ark on the constructive trust claim. Ark appeals the summary judgment award on conversion and Variety cross-appeals on the constructive trust summary judgment.

## II. Analysis

On appeal Ark initially contends that the trial court was correct in awarding summary judgment in its favor on Variety's claim for constructive trust. Ark also contests the trial court's granting of summary judgment in favor of Variety on Variety's conversion claim. In the alternative, Variety on cross-appeal challenges the trial court's decision on the constructive trust issue and moves to affirm the decision on the conversion claim. For the following reasons we agree with the trial court's decision in granting summary judgment in favor of Ark on the constructive trust claim, but reverse in favor of Ark on the conversion claim.

### A. Constructive Trust

[1] The first issue raised on appeal is whether the trial court erred in granting summary judgment in favor of Ark on Variety's claim for constructive trust. As there is no evidence to warrant the existence of a fiduciary or confidential relationship between Ark and Variety, we affirm the decision of the trial court in granting judgment as a matter of law in favor of Ark regarding the constructive trust claim.

This Court reviews the trial courts' rulings on motions for summary judgment *de novo* and views the evidence in the light most favorable to the non-moving party. *Scott & Jones, Inc. v. Carlton Ins. Agency, Inc.*, 196 N.C. App. 290, 293, 677 S.E.2d 848, 850 (2009). In determining whether summary judgment is appropriate our Court reviews whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2009).

Variety claims that, because the trial court ruled in its favor on the conversion claim, it implies a fiduciary relationship between Variety and Ark sufficient enough to establish a constructive trust. Variety also argues that Ark owed it a fiduciary duty by being in possession of Variety's allegedly converted funds and by having a position on Salem's Board of Directors.

For a constructive trust to arise there must be a fiduciary relationship between the parties and no adequate remedy at law. *See Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965). Variety's claim for constructive trust fails because it cannot establish that Ark owed it a fiduciary duty. A fiduciary relationship is one in which " 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] "it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*" ' " *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (citations omitted)). A constructive trust must be established by clear and convincing evidence. *Upchurch v. Upchurch*, 128 N.C. App. 461, 464, 495 S.E.2d 738, 740 (1998).

Here, Variety did not present sufficient evidence to warrant a constructive trust. Variety and Ark were not in privity of contract and the Freight Agreement did not establish any such relationship. Further, Ark did not exercise domination or influence over Variety. As will be further discussed below, Ark did not wrongfully possess Variety's funds or deprive Variety of its rights and dominion over the funds. Consequently, Ark did not owe a fiduciary duty to Variety and Variety's claim for constructive trust fails. We affirm the trial court's granting of summary judgment in favor of Ark regarding Variety's claim for constructive trust.

B. Conversion

[2] The second issue raised on appeal is whether the trial court erred in granting summary judgment in favor of Variety on its claim for conversion. Ark contends that Variety's conversion claim fails as a matter of law because Variety did not retain an ownership interest in the contested funds. We agree.

A claim for common law conversion is established by the showing of " 'an unauthorized assumption and exercise of the right of owner-

ship over goods or personal chattels belonging to another, to the alteration of their condition, or the exclusion of an owner's rights.' " *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (quoting 89 C.J.S. Trover & Conversion § 1 (1955)). The party claiming conversion must prove that it retained lawful ownership in the chattel and a right to immediate possession. *See Patterson v. Allen*, 213 N.C. 632, 197 S.E. 168 (1938).

Variety argues that it retained an ownership interest in the funds when transferred to Salem because the Freight Agreement established a bailment relationship. Variety has the burden of establishing a bailor-bailee relationship between it and Salem. *Troxler v. Bevill*, 215 N.C. 640, 643, 3 S.E.2d 8, 10 (1939). "A bailment is created upon the delivery of possession of goods and the acceptance of their delivery by the bailee." *Fabrics, Inc. v. Delivery Service*, 39 N.C. App. 443, 447, 250 S.E.2d 723, 726 (1979). "An acceptance is established upon a showing directly or indirectly of a voluntary acceptance of the goods under an express or implied contract to take and redeliver them." *Id.* Money may be the object of a bailment relationship. *Crow v. McCullen*, 235 N.C. 380, 383, 70 S.E.2d 198, 200 (1952).

We must interpret the Freight Agreement by examining the language of the Agreement for the parties' intent. *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). An "actual meeting of minds is necessary for an implied bailment." 8 C.J.S. Bailments § 28 (2011). Variety attempts to rely on the wording of Schedule A of the Freight Agreement, describing Salem's required process for performing the services, to establish a bailment relationship. The relevant section provides: "(8) Payment is received from client," and "(9) Monies are immediately distributed to carriers." Black's Law Dictionary defines payment as "[t]he money or other valuable thing so delivered in satisfaction of an obligation." Black's Law Dictionary 1165 (8th ed. 2004).

The use of the term "payment" is clear, so we may infer that Variety and Salem intended that the money transferred was for the satisfaction of an obligation in the form of Salem's services. But there was not a sufficient meeting of the minds to establish a bailment relationship. Variety failed to show that Salem accepted the payments with the intent to redeliver the exact funds. In fact, Salem's financial statements treated the funds due Salem pursuant to Schedule A as "revenue" and the payments to carriers as "costs of goods sold."

The use of the term "payment" does not support an interpretation that Variety retained ownership in the funds upon transfer. Variety's own leaders acknowledged in their depositions that Salem could have satisfied its obligation by paying the carriers from Salem's general funds and did not necessarily need to use the exact funds received from Variety. If Variety desires to create a bailment relationship in these situations, it will have to devise a stronger freight agreement, which clearly spells out the relationship. Based on the current Freight Agreement, Variety did not retain ownership in the funds and therefore does not present sufficient evidence to support a conversion claim. Consequently, we reverse the trial court's granting of summary judgment in favor of Variety and in turn grant Ark's motion for summary judgment on the issue of conversion.

We would note that the trial court's reliance on *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 551 S.E.2d 546 (2001), is misplaced. In *Lake Mary* the defendant admitted that he did not have an ownership interest. The case at hand is distinguishable in that Ark never admitted that it did not have an ownership interest in the funds and, in actuality, argued the complete opposite. Even further, as stated above, the Freight Agreement did not support Variety's retaining of any ownership rights in the funds.

We reverse the trial court's decision on Variety's conversion claim; therefore, we decline to address the issue of damages or the applicability of the Uniform Commercial Code.

### III. Conclusion

For the above mentioned reasons, we affirm in part and reverse in part the Order of the trial court.

Affirmed in part and reversed in part.

Judges HUNTER (Robert C.) and BRYANT concur.