IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-685

Filed 06 June 2023

Guilford County, No. 21 CRS 028347

STATE OF NORTH CAROLINA

v.

KURT ANTHONY STORM, Defendant.

Appeal by Defendant from judgment entered 17 February 2022 by Judge Lora Christine Cubbage in Guilford County Superior Court. Heard in the Court of Appeals 7 March 2023.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Llogan R. Walters, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R. Grant, for defendant-appellant.*

MURPHY, Judge.

Traditionally, a bailor-bailee relationship exists only where an item of personal property is to be returned to the bailor by the bailee. While narrow exceptions to this rule have previously led us to include the delivery of a check on behalf of a bailor by a bailee to a third party within the definition of "bailment," we have never deviated—and do not now deviate—so far from the traditional definition of bailment that an investment adviser, whose work entails complex discretionary judgments about a client's money as a fungible asset, would qualify as a "bailee." Here, where, in the

light most favorable to the State, Defendant agreed to act as an investment adviser for the alleged victim, his conversion of funds entrusted to him in that capacity could not have formed the basis of his conviction for conversion of funds by a bailee because he was not, as a matter of law, a bailee.

## BACKGROUND

On or about June of 2014, Audrey Lewis discontinued her employment at American National Insurance Company after more than fifteen years to open her own insurance agency. Shortly thereafter, Lewis began attending networking meetings for small business owners hosted by Defendant Kurt Anthony Storm. Lewis kept attending these meetings through 2017, and she developed a friendship with Defendant, with the two frequently carpooling together.

In 2017, Lewis received a letter from American National indicating that she had over $25,000.00 in a retirement fund of which she was previously unaware. Hoping to reinvest the money and recalling from earlier in their relationship that Defendant was a financial adviser, Lewis contacted Defendant and asked him to invest the money on her behalf. In order to invest the money, Defendant set up an entity called A.R. Lewis, LLC ("ARL") on 10 April 2017 and created a bank account on its behalf. Defendant accepted approximately $6,300.00 in cash as a fee for his investment services, then further accepted a check for $17,500.00 in the name of ARL, ostensibly to invest on Lewis's behalf. After Lewis gave Defendant the money, their agreement was memorialized in the following *Promissory Note*:

Agreement between Kurt Storm and ARLEWIS LLC-Audrey Renee Lewis [r]epresenting ARLewis LLC. Principal sum of $23,836.09 will be managed by Kurt Storm.

**I. Promise to Pay**
Kurt Storm agrees to pay 9% annual rate fixed earnings, credited monthly in cash.

**II. Repayment**
The amount this Promissory Note will be returned 12 months from inception unless death or Storm's inability to perform task [sic] associated with this role and/or mutual agreement of both parties.

**III. Transfer of the Promissory Note – POD applies as well as this Note as fail-safe [sic]. Entire balance will be paid to ARLewis, LLC directly at office 2216 Meadowview Drive, Greensboro, NC 27407[.]**

**IV. Amendment; Modification; Waiver**
No amendment, modification or waiver of any provision of this Promissory Note or consent to departure therefrom shall be effective unless by written agreement signed by both Borrower and Lender.[1]

**V. Successors**
The terms and conditions of this Promissory Note shall inure to the benefit of and be binding jointly and severally upon the successors, assigns, heirs, survivors and personal representatives of Kurt Storm and shall inure to the benefit of any holder, its legal representatives, successors and assigns.

**VI. Governing Law**
The validity, construction and performance of this Promissory Note will be governed by the laws of North Carolina, excluding that body of law pertaining to conflicts

---

1 No party contends on appeal that this language in the *Promissory Note* rendered the agreement a loan rather than an investment.

of law. Borrower hereby waives presentment notice of non-payment, notice of dishonor, protest, demand and diligence.

The parties hereby indicate by their signatures below that they have read and agree with the terms and conditions of this agreement in its entirety.

After several months, in October of 2017, Lewis contacted Defendant again to inquire as to where the funds went. Lewis made several failed attempts to call and email Defendant about the funds in October and November of 2017, including one period during which Defendant blocked Lewis's email. Defendant eventually informed Lewis that he was in poor health, then once again ceased contact until January of 2018. After Defendant stopped responding for the second time, Lewis indicated to Defendant in an email dated 11 January 2018 that she would report him to law enforcement unless she heard from him. After Lewis reported Defendant to law enforcement, Defendant responded that he would like to "work this out so [there will] be no bad blood," and the two arranged to meet at a restaurant. Upon meeting in person, Defendant presented Lewis with information about other accounts he had worked on but provided Lewis with no concrete details regarding the money she had given to him to invest. Nonetheless, in light of Defendant's presentation, Lewis was convinced that her money had been invested.

On 16 January 2018, having received Lewis's report, the Greensboro Police Department assigned Detective Michael Montalvo to investigate what had happened to the funds. After a phone call with Lewis on 25 January 2018 detailing

substantially the aforementioned facts, Detective Montalvo called Defendant on 29 January 2018 seeking an explanation as to the funds' whereabouts. The call resulted in a follow-up meeting in person at Detective Montalvo's office on 8 February 2018. During the 8 February follow-up, Defendant said of the funds that he was "not off the hook" and that "[he knew] that [he had] to pay back th[e] money[,]" suggesting that he pay Lewis back in $150.00 installments once per month. Defendant then asked Detective Montalvo what kind of criminal proceedings he could expect to see as a result of the incident, and Montalvo explained that "if you just give [Lewis] the [$17,500.00] now, this goes away. There won't be any criminal charges." Defendant responded that he didn't have the money.

Detective Montalvo's subsequent investigations revealed no account into which the funds had ever been placed.

Defendant was indicted for obtaining property by false pretenses and felony computer access on 9 July 2018, then subsequently indicted for embezzlement on 6 May 2019 and conversion of property by bailee on 19 April 2021. The indictment for conversion of property by bailee read as follows:

> The jurors for the State upon their oath present that on or about the date of offense shown above and in the county named above the defendant named above unlawfully, willfully and feloniously did being entrusted with property, seventeen thousand five hundred dollars ($17,500.00) in good and lawful United States currency owned by Audrey Renee Lewis, as a bailee, fraudulently secrete the property with the fraudulent intent to convert it to the defendant's own use and/or convert the property to the defendant's own

use. The value of the property was in excess of four hundred dollars ($400.00).

Defendant was tried on 15 February 2022. During trial, the State voluntarily dismissed the felony computer access charge. At the close of the State's evidence, Defendant moved to dismiss the charges of conversion of property by bailee and embezzlement. The trial court initially denied the motion; however, after Defendant renewed the motion at the close of all evidence and made a separate motion to dismiss for fatal variance between the indictment and evidence, the trial court dismissed the embezzlement charge. The jury convicted Defendant of the single remaining charge of felony conversion of property by bailee, and the trial court sentenced him to a suspended sentence of 6 to 17 months.

## **ANALYSIS**

On appeal, Defendant argues the trial court erred in failing to dismiss the charge of felony conversion of property by bailee under N.C.G.S. § 14-168.1 because, as a matter of law, he did not qualify as a bailee when he took possession of the funds at issue. Defendant also separately argues the charge should have been dismissed due to fatal variance between the indictment and the evidence presented at trial. However, as we agree that Defendant was not a bailee for purposes of the conversion charge, we need not reach the fatal variance issue.

Under N.C.G.S. § 14-168.1,

> [e]very person entrusted with any property as *bailee*, lessee, tenant or lodger, or with any power of attorney for

the sale or transfer thereof, who fraudulently converts the same, or the proceeds thereof, to his own use, or secretes it with a fraudulent intent to convert it to his own use, shall be guilty of a Class 3 misdemeanor.

N.C.G.S. § 14-168.1 (2021) (emphasis added). "A bailment is created when a third person accepts the sole custody of some property given from another." *Barnes v. Erie Ins. Exch.*, 156 N.C. App. 270, 273, *disc. rev. denied*, 357 N.C. 457 (2003). Traditionally, the object of bailment is a specific item of real property.[2] *See Bailment*, Black's Law Dictionary 174 (11th Ed. 2019) (first emphasis added) ("A delivery *of personal property* by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose, usu[ally] under an express or implied-in-fact contract."); *e.g. State v. Woody*, 132 N.C. App. 788, 789 (1999) (a computer); *Wilson v. Burch Farms, Inc.*, 176 N.C. App. 629, 641 (2006) (potatoes); *Martin v. Cuthbertson*, 64 N.C. 328, 328 (1870) (a horse). Moreover, historically, a bailment relationship contemplated the return of the transferred item of personal property. *Sturm v. Boker*, 150 U.S. 312, 329-30 (1893) ("The recognized distinction between bailment and sale is that when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On

---

[2] Older North Carolina caselaw uses the term "chattel," usually connoting specific physical items, to refer to the object of bailment. *See Cooke v. Foreman Derrickson Veneer Co.*, 169 N.C. 493, 494 (1915) ("At common law bailment contracts are largely implied from the character of the transactions. From the delivery of a chattel in bailment the law implies an undertaking upon the part of the bailee to execute the bailment purpose with due care, skill and fidelity."); *see also Chattel*, Black's Law Dictionary 295 (11th Ed. 2019) ("Movable or transferable property; personal property; esp[ecially] a physical object capable of manual delivery and not the subject matter of real property.").

the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed; the transaction is a sale.")

Though not archetypally an object of bailment, money can, under certain circumstances, act as such. In *State v. Eurell*, our Supreme Court stated that "[o]ne who receives money for safe keeping . . . is a bailee if under the agreement of the parties he is to return the identical money received, and debtor if he is to use the money and return its equivalent on demand." *State v. Eurell*, 220 N.C. 519, 519 (1941). And, in *State v. Minton*, we held—without discussion—that a bailor-bailee relationship existed where checks were provided to the defendant to, in turn, pay a third party. *State v. Minton*, 223 N.C. App. 319, 322 (2012), *disc. rev. denied*, 366 N.C. 587 (2013). However, we have also reiterated the principle that whether a bailment relationship has been created with respect to money depends on whether the agreement requires the use of "exact funds" as opposed to treating the money as fungible. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 212 N.C. App. 400, 405 (2011), *rev'd on other grounds*, 365 N.C. 520, 524 (2012) ("[W]e conclude it is unnecessary to address the bailment argument."); *also cf. United States v. Eurodif S. A.*, 555 U.S. 305, 320 (2009) ("[W]here a constituent material is untracked and fungible, ownership is usually seen as transferred, and the transaction is less likely to be a sale of services, as the [U.S. Supreme] Court explained years ago in distinguishing a common law bailment from a sale[.]").

The holding in *Minton*, especially in light of *Variety Wholesalers*, appears to be an extension of—albeit a deviation from—the principle that, "where a *consignment* relationship [exists] between [two parties to an agreement], the relationship [is] also that of a bailment."[3] *Wilson*, 176 N.C. App. at 641, 642 (emphasis added) (marks and citations omitted) ("A consignment is a type of bailment where the goods are entrusted for sale. . . . A consignment exists where a[] consignor leaves his property with a consignee who is substantially engaged in selling the goods of others, and will work to sell the goods on behalf of the consignor. After selling the goods, the consignee must account to the consignor with the proceeds from the sale."). As in a consignment relationship, the bailor in *Minton* entrusted the defendant with a specific check and asked the defendant, the bailee, to use the check in a particular transaction. *Minton*, 223 N.C. App. at 322. In that case, the transaction was a rental payment, though the transaction in a consignment relationship is the sale of the transferred property. *Id.* at 320; *Wilson*, 176 N.C. App. at 629; *see also Consignment*, Black's Law Dictionary 385 (11th Ed. 2019) ("[A] transaction in which a person delivers goods to a merchant for the purpose of sale[.]"). While the transaction in *Minton* lacked the accounting feature that otherwise conceptually tethered consignment to traditional bailment, *see*

---

[3] The notion of consignment as a specialized form of bailment appears to, in turn, be an extension of the traditional notion that goods transformed by a bailee may still be the object of a bailment relationship. *See Powder Co. v. Burkhardt,* 97 U.S. 110, 116 (1877) ("[W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer.").

*Wilson*, 176 N.C. App. at 642, the limited nature of the control the bailee was meant to exercise in that case meant that the type of control exercised by the bailee generally resembled the specific, limited purposes for which bailors entrust property to bailees in more traditional bailment relationships.

In the instant case, the State argues, by analogy to *Minton*, that Defendant possessed Lewis's funds pursuant to a bailment relationship. This contention, however, deviates too far from the fundamental bailor-bailee paradigm. Bailment, by nature, involves a limited degree of control by the bailee over property transferred by the bailor "for a certain purpose[.]" *Bailment*, Black's Law Dictionary 174 (11th Ed. 2019). It usually involves a return of the exact property, *see Eurell*, 220 N.C. at 519; *Sturm*, 150 U.S. at 329-30; and, where narrow exceptions to that rule exist, they exist for arrangements in which the bailee exercises control in a specific enough manner so as to still resemble traditional bailment. *See Wilson*, 176 N.C. App. at 641; *Minton*, 223 N.C. App. at 322.

Here, to consider Defendant a "bailee" would be to allow these exceptions to swallow the rule. For purposes of this appeal, the uncontroverted status of Defendant's and Lewis's relationship was that of an investment adviser and advisee. *See* N.C.G.S. § 78C-2(1) (2021) ("'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part

of a regular business, issues or promulgates analyses or reports concerning securities. 'Investment adviser' also includes financial planners and other persons who, as an integral component of other financially related services, provide the foregoing investment advisory services to others for compensation and as a part of a business or who hold themselves out as providing the foregoing investment advisory services to others for compensation."). Defendant was neither obligated nor expected to return the exact check given to him to Lewis. Moreover, unlike the defendant in *Minton*, Defendant was not tasked with simply acting as a courier for a check; rather, he was entrusted with a complex series of decisions concerning the investment of the funds as a fungible asset. While we express no opinion on the ongoing correctness of our opinion in *Minton* in light of its deviation from the fundamental precepts of bailment theory,[4] we decline to redouble that deviation here. Defendant was not a bailee, and we reverse the trial court's decision not to dismiss Defendant's charge on that basis.

Having so held, Defendant's remaining argument concerning fatal variance between the indictment and evidence presented at trial is moot. *Roberts v. Madison Cty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398-99 (1996) (citation omitted) ("A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy.").

---

[4] Nor could we overturn that decision ourselves if we were so inclined. *In re Civil Penalty*, 324 N.C. 373, 384 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

## **CONCLUSION**

Defendant's conversion of Lewis's funds could not have properly resulted in his conviction under N.C.G.S. § 14-168.1 because he was not a bailee. Accordingly, we vacate the judgment. *Woody*, 132 N.C. App. at 792.

VACATED.

Judge RIGGS concurs.

Judge ARROWOOD concurs in judgment only by separate opinion.

ARROWOOD, Judge, concurring in judgment only.

While I agree that our precedent compels the majority to hold that the trial court erred in failing to dismiss the felony conversion of property by a bailee charge, and their finding that defendant did not qualify as a bailee, I write separately to express my concern that a precedent, as ancient as the concepts of bailment and conversion itself, compels such a holding.

"A bailment is created upon the delivery of possession of goods and the acceptance of their delivery by the bailee." *Flexlon Fabrics, Inc. v. Wicker Pick-Up & Delivery Serv., Inc.*, 39 N.C. App. 443, 447, 250 S.E.2d 723, 726 (1979) (citation omitted). Delivery requires "the bailor [to relinquish] exclusive possession, custody, and control to the bailee . . . ." *Id.* (citations omitted). "[A]cceptance is established upon a showing directly or indirectly of a voluntary acceptance of the goods under an express or implied contract to take and redeliver them." *Id.* Although historically the law may have contemplated the return of the exact property, our case law has recognized exceptions where a bailee is not required to return the identical item to the bailor in all circumstances. *See Wilson v. Burch Farms, Inc.*, 176 N.C. App. 629, 641, 627 S.E.2d 249, 259 (2006) (citations omitted) ("While the consignee may or may not receive the specific property of the consignment back, . . . this Court has recognized that a consignment creates a bailment between the parties.").

Precedent holds that when the subject of the bailment is money, a bailment relationship is only established if the bailee is required "to return the identical money

received[.]" *State v. Eurell*, 220 N.C. 519, 520, 17 S.E.2d 669, 670-71 (1941) (finding that one who is expected "to return the identical money received" is a bailee); *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 212 N.C. App. 400, 405, 712 S.E.2d 361, 365, *review allowed, writ allowed*, 717 S.E.2d 371 (N.C. 2011) (finding the plaintiff could not prove a bailment relationship existed because the agreement between the parties "was not a sufficient meeting of the minds to establish a bailment relationship[,]" as the agreement did not show defendant was expected "to redeliver the exact funds") *rev'd on other grounds*, 365 N.C. 520, 723 S.E.2d 744 (2012). From this language, it is unclear whether "exact funds" refers to the return of an identical sum, or the exact money left in the bailee's possession. Either way, I see no reason why the rule reiterated in *Eurell* and *Variety Wholesalers* should continue to shield defendants from liability in cases such as this, where investors have been entrusted with large sums of money for the benefit of a third-party and intentionally and wrongfully convert those funds prior to investing them.

If "exact funds" refers to the return of the exact amount, I do not see why Ms. Lewis's expectation of the return of more money should extinguish the bailment relationship. Ms. Lewis delivered the funds to defendant, relinquishing possession and control, and defendant accepted the funds. Furthermore, the promissory note between the parties showed that defendant was expected to return money to Ms. Lewis. That Ms. Lewis was expecting more than the initial investment, and defendant's title as an "investor" should be of no consequence.

2

If "exact funds" refers to the return of the exact investment Ms. Lewis initially made, I believe that our Supreme Court has expressed movement away from this requirement and would be receptive to the adoption of the exact sum requirement adopted by other jurisdictions. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 528-29, 723 S.E.2d 744, 750-51 (2012) (finding in the context of conversion that defendant's assertion that the plaintiff could not "maintain a claim for conversion of money unless the funds in question [could] be specifically traced and identified[,]" and were "not commingled" was outdated, as this requirement "has been complicated as a result of the evolution of our economic system[,]" and in response to "this reality, numerous courts around the country have adopted rules requiring the specific identification of a sum of money, rather than identification of particular bills or coins[,]" thus as long as the plaintiff could show the "specific amount" that he transferred, where the funds originated, and which account the funds were transferred to, the funds were identifiable). Indeed, the movement away from the return of the "exact funds" in conversion cases has been adopted by other jurisdictions. *Nat'l Corp. for Hous. P'ship v. Liberty State Bank*, 836 F.2d 433, 436 (8th Cir. 1988) (citations omitted) (holding the "ancient rule" "requiring [the] return of the identical item has been liberalized in the case of bailment of fungible goods"); *Repplier v. Jacobs*, 149 Pa. 167, 169, 24 A. 194, 194 (1892) (finding that "[f]or all ordinary purposes, in law as in the business of life, *the same sum of money is the same money*, whether it be represented by the identical coin

3

or not") (emphasis added).

For either situation, I see no reason why the rule requiring the return of the exact funds should continue to shield "investment advisors" from liability in conversion cases where they have been entrusted with large sums of money for the benefit of a third-party and intentionally and wrongfully convert those funds prior to investing them. Although I agree that precedent compels the findings set forth in the majority opinion, I think precedent from 1941 should be reconsidered by our Supreme Court.

Thus, I concur in judgment only.