VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVS., LLC

[365 N.C. 520 (2012)]

VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVICES, LLC; SALEM LOGISTICS, INC.; SALEM LOGISTICS TRANSPORT SERVICES, LLC; WINSTON TRANSPORTATION MANAGEMENT, LLC; OVERBROOK LEASING, LLC; SALEM LOGISTICS TRANSPORT FINANCE, LLC; DAVID F. ESHELMAN; AND ARK ROYAL CAPITAL, LLC

No. 269PA11

(Filed 13 April 2012)

### 1. Conversion— ownership of funds—genuine issue of material fact—summary judgment improper

The trial court erred in a case involving a claim of conversion arising out of a third party's possession of funds, ownership of which was disputed between the primary contracting parties, by entering summary judgment in favor of plaintiff. The record forecasted genuine issues of material fact concerning contractual intent and whether plaintiff retained ownership of the funds. Furthermore, summary judgment was improper on defendant Ark's defenses of bona fide purchaser without notice and commingling where there were genuine issues of material fact remaining. Ark's defense of lack of possession of the funds was meritless.

### 2. Trusts— constructive trust—no fiduciary relationship— genuine issue of material fact—summary judgment improper

The trial court erred in a case involving a claim of constructive trust arising out of a third party's possession of funds, ownership of which was disputed between the primary contracting parties, by entering summary judgment in favor of defendants. The record forecasted genuine issues of material fact with respect to the claim and both the Court of Appeals and the trial court relied on the erroneous assumption that there could be no constructive trust in the absence of a fiduciary relationship.

On discretionary review pursuant to N.C.G.S. § 7A 31 of a unanimous decision of the Court of Appeals, —— N.C. App. ——, 712 S.E.2d 361 (2012), affirming in part and reversing in part an order on summary judgment entered 19 April 2010, as amended on 12 May 2010, by Judge Howard E. Manning, Jr. in Superior Court, Vance County. Heard in the Supreme Court 10 January 2012.

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene, Tobias S. Hampson, and Paul J. Puryear, Jr., for plaintiff-appellant.*

**VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVS., LLC**

[365 N.C. 520 (2012)]

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jim W. Phillips, Jr. and Alexander Elkan, for defendant-appellee Ark Royal Capital, LLC.*

*Bell, Davis & Pitt, P.A., by William K. Davis and Alan M. Ruley, for North Carolina Bankers Association, amicus curiae.*

HUDSON, Justice.

Here we address whether summary judgment was appropriately entered on claims of conversion and constructive trust when a third party came into possession of funds, ownership of which was disputed between the primary contracting parties. We hold that the record forecasts genuine issues of material fact with respect to both claims, and we therefore reverse and remand for further proceedings.

*Background*

Variety Wholesalers ("Variety") is a large retail corporation with stores in fourteen states. To support its stores, Variety maintains significant shipping and trucking operations. At times pertinent here Salem Logistics ("Salem"), now bankrupt, provided logistical services to businesses, including freight bill auditing services. Ark Royal Capital, LLC ("Ark") is an investment company that provides, among other services, asset-based loan arrangements to businesses. Asset-based loans are described here as a means for undercapitalized companies that cannot obtain traditional loans to receive a loan in exchange for a security interest in their assets, often accounts receivable.

In March 2006 Salem entered into an asset-based loan agreement with Ark. Under that agreement (hereafter "Finance Agreement") Ark provided a revolving line of credit to Salem through which Salem could pay its operating expenses. In exchange, Salem gave Ark a security interest in all its assets. The Finance Agreement capped the line of credit at the lesser of $2.2 million or 80% of Salem's "Eligible Accounts," which it defined as "valid, legally enforceable obligation[s]" that were "not subject to any claim, dispute or other defense." Under the Finance Agreement Ark required Salem to forward any funds it received and to instruct its customers to send payments directly to a lockbox account maintained by Ark at Wachovia Bank (now Wells Fargo[1]). Ark used the money that came into the lockbox account to pay itself the interest and principal on Salem's revolving

---

1. In December 2008 Wells Fargo acquired Wachovia; by October 2011 the names of all ongoing Wachovia entities had been changed to Wells Fargo.

line of credit, thereby making further credit available to Salem. Salem had multiple clients that paid into the lockbox account, and the funds from those multiple clients were not segregated. Ark's Chief Operating Officer, Allison Hanslik, joined Salem's Board of Directors under the loan arrangement. Hanslik and research analyst David Pearson reviewed Salem's accounts on a weekly basis before issuing borrowing certificates.

In July 2007 Variety entered into a contract (hereafter "Freight Agreement") with Salem under which Salem would provide freight bill payment and auditing services.[2] The Freight Agreement has two distinct parts. Schedule A, titled "Services Provided," describes the services that Salem would provide to Variety under that Agreement. Salem agreed to receive all of Variety's freight bills from the carriers, audit the bills, prepare a master invoice for the bills, and send the invoice to Variety weekly. Variety would then send Salem the full amount shown on the master invoice. Salem would then pay the carriers. Schedule B of the Freight Agreement, titled "Contractor Rates and Charges," describes the amounts Variety would pay to Salem for its services: $0.68 for each paper freight bill, $0.38 for each electronic freight bill, and $0.18 per small package. By letter Salem requested that Variety send the amounts on the master invoices directly to the Wachovia account, but did not inform Variety that the account was actually controlled by Ark.

Throughout the time Variety operated under the Freight Agreement, the company fielded complaints from its carriers that their payments were arriving late or not at all. Variety worked with Salem in an effort to alleviate the problem. Salem promised to do so but problems continued. Variety terminated the Freight Agreement in December 2008 and filed suit in January 2009 for recovery of approximately $888,000 it had forwarded to Salem which had not been paid to carriers. In the process Variety sought and received an order of attachment on the Wachovia account it believed belonged to Salem. In so doing Variety discovered that the account actually belonged to Ark. Variety demanded the missing funds be returned by Ark but Ark refused. Variety then amended its complaint to add Ark as a defendant.

The trial court conducted a period of discovery and depositions and received filings in support of and opposition to the parties' motions for summary judgment. After a hearing, the trial court

2. Variety and Salem also discussed and negotiated a proposal for Salem to provide some shipping services in addition to the bill auditing services; however, a draft agreement on this subject was never signed.

entered summary judgment for Variety on its claim of conversion against Ark, and for Ark on Variety's claim of constructive trust. The trial court ordered Ark to pay Variety $887,889.37, plus interest. The Court of Appeals reversed, and entered summary judgment for Ark on both issues. We now reverse and remand on both issues.

### Summary Judgment

The standard of review for an order of summary judgment is firmly established in this state. We review a trial court's order granting or denying summary judgment de novo. *Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) (citation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2011). "All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). "The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense . . . ." *Id.* (citation omitted).

### Conversion

[1] Variety's first claim against Ark alleges conversion. This Court has stated that "[t]he tort of conversion is well defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (citation omitted). This definition has been cited as recently as 20 March 2012 by the Court of Appeals. *Vaseleniuck Engine Dev., LLC v. Sabertooth Motorcycles, LLC*, —— N.C. App. ——, —— S.E.2d ——, 2012 WL 924875, at *2 (Mar. 20, 2012) (No. COA11-870). There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant. *See Gadson v. Toney*, 69 N.C. App. 244, 246, 316 S.E.2d 320, 321-22 (1984). For Variety to maintain a conversion action against Ark, Variety must first establish that it retained ownership of the funds it sent to Salem under Schedule A of the Freight Agreement.

Before both the Court of Appeals and this Court, Variety offered a theory of bailment to show that it retained ownership of the funds

at issue, but we conclude it is unnecessary to address the bailment argument. The question is one simply of contractual intent: whether the agreement between Variety and Salem contemplated that the funds sent by Variety under Schedule A would become Salem's property or would merely pass through Salem on their way from Variety to Variety's carriers.

Variety argues that the contract's terms specifically describe a several step process in which the funds Variety sent to Salem under Schedule A would be used exclusively and immediately to pay Variety's carriers. The pertinent steps of this process as shown in Schedule A ("Services Provided") of the Freight Agreement are: "7. A master invoice id [sic] prepared once a week and submitted to Client in electronic or hard copy format (or both)[.] 8. Payment is received from client. 9. Monies are immediately distributed to carriers[.]"

The Court of Appeals interpreted the provisions of the contract to contemplate that in Step 8, Variety would pay Salem the amount on the master invoice in compensation for Salem's services, and that in Step 9, Salem would pay, out of its general funds, the bills to the carriers. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* —— N.C. App. ——, ——, 712 S.E.2d 361, 365 (2011). The court based its conclusion on its interpretation of the term "payment" and the use of different terms ("payment" vs. "monies") in Steps 8 and 9. *Id.* at ——, 712 S.E.2d at 365. Specifically, the court stated that

> Black's Law Dictionary defines payment as "[t]he money or other valuable thing so delivered in satisfaction of an obligation."
>
> The use of the term "payment" is clear, so we may infer that Variety and Salem intended that the money transferred was for the satisfaction of an obligation in the form of Salem's services.
>
> The use of the term "payment" does not support an interpretation that Variety retained ownership in the funds upon transfer.

*Id.* at ——, 712 S.E.2d at 365 (brackets in original) (citation omitted). While this is one possible interpretation of the contract, we do not agree that this can be its only meaning as a matter of law, thus justifying summary judgment.

Instead, we see more than one possible meaning, depending on the resolution of certain disputed facts, such as those determining intent. Intent is a question of fact. Here there is conflicting evidence on the factual matters bearing on contractual intent, which is the

central inquiry in determining whether Variety retained ownership of the funds. As such, the question of contractual intent poses a genuine issue of fact material to Variety's conversion claim. As this Court has previously stated, "[w]hen an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury. 'An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.' " *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008) (citations omitted).

Moreover, we have stated that contracts are to be construed " 'consistently with reason and common sense.' " *Stephens Co. v. Lisk,* 240 N.C. 289, 293, 82 S.E.2d 99, 101 (1954) (citation omitted). Common sense can suggest that the contract may not have been intended to mean that Variety would pay $887,889.37 of Variety's money to Salem in compensation for its service in paying $887,889.37 of Salem's money to Variety's carriers. Rather, some evidence suggests that the contract intended that Variety fund the invoices by providing Salem with $887,889.37 that Salem was expected to "immediately distribute[ ]" among the carriers according to Schedule A, and that Salem was paid separately for its services under Schedule B. This reading of the contract is supported by language from the Freight Agreement stating that Schedule A deals expressly with "Services Provided" and Schedule B describes the "Contractor Rates and Charges."

The materials in the record provide evidence to support both of these interpretations. George Blackburn, Variety's general counsel, testified at deposition that "[o]ur understanding was . . . the funds actually belonged to either Variety or the carrier," and "the contract contemplated that all that ever happened was [the money] passed through Salem's hands." Tim Hedgepeth, Variety's transportation manager for the second half of the Salem contract, also testified that "money was *funded* to Salem" and the money sent "was to pay those invoices." On the other hand, Salem's Chief Financial Officer, Kerry Yow, testified that Salem treated the funds Variety sent as "revenue" and the payments to carriers as "costs of goods sold." When Ark had Salem conduct an audit of receivables in October 2008, Variety confirmed by letter that the amounts owed on their accounts were receivables. While this is only a small sampling of the available evidence and testimony, it reveals a conflict over the meaning of these contractual terms. Therefore, we conclude that this genuine issue of the material fact of contractual intent precludes summary judgment on the conversion claim.

In lieu of simply remanding at this point, though, we conclude that some further discussion of secondary issues is warranted. By granting summary judgment in Variety's favor on the conversion claim, the trial court implicitly addressed and rejected Ark's defenses of bona fide purchaser without notice, commingling, and lack of possession of the funds.

In its First Affirmative Defense, Ark claimed that Variety's payments "were commingled with other funds and re-advanced to Salem and Ark Royal is no longer in possession of those funds." In its Fourth Affirmative Defense, Ark claimed that it "gave value for the Variety accounts receivable and the payments on these accounts without knowledge that these accounts receivable or the funds in payment thereof were anything other than what the Salem Logistics Defendants represented them to be." Further, in its Motion for Summary Judgment, Ark argued that summary judgment in its favor was appropriate because Variety's money "was immediately commingled with other monies and was not thereafter segregated or specifically identifiable and a conversion claim cannot lie under such circumstances" and because Ark "received funds in good faith without notice of any adverse claim to such funds and gave value therefor." Thus, Ark clearly raised these defenses at the trial level, and the trial court by necessity resolved all of these defenses against Ark. For the sake of clarity, at least as to which issues remain for trial among those properly presented to this Court, we conclude the better approach is to address these secondary aspects of the conversion claim.

### Bona Fide Purchaser Defense

If a jury were to decide the question of contractual intent—and thus ownership of the funds—against Variety, the conversion claim would end there. On the other hand, if the Freight Agreement is interpreted to designate Salem as a mere conduit such that the funds remained Variety's property until paid to the carriers, Variety and the trial court must then contend with Ark's defense that Ark "gave value for the Variety accounts receivable." In essence this argument, pleaded as Ark's fourth affirmative defense, is that Ark was a bona fide purchaser for value without notice that Salem may have been simply a conduit. A party who comes into possession of stolen or converted funds " 'will not be permitted thus to use [the] funds when he is fully aware of their nature, or there are circumstances to awaken suspicion and put him on inquiry,' " *Lavecchia v. N.C. Joint Stock Land Bank of Durham*, 215 N.C. 73, 74, 1 S.E.2d 119, 120 (1939)

(citations omitted); however, under the same circumstances, "a bona fide purchaser for value, without notice" receives "good title against the world." *Stricker v. Buncombe Cnty.*, 205 N.C. 536, 538, 172 S.E. 188, 189 (1934) (citation and quotation marks omitted). Though Ark denies having had any knowledge about Variety's potential possessory interest in the funds at issue, it is important to note that Ark bears the burden of proof on its affirmative defense. *See Lawing v. Jaynes*, 285 N.C. 418, 430, 206 S.E.2d 162, 170 (1974) (stating that " 'he who claims to be a *bona fide* purchaser for value without notice . . . has the burden of proving that fact' " (quoting *Whitehurst v. Abbott*, 225 N.C. 1, 7, 33 S.E.2d 129, 133 (1945))). Thus, if Ark proves it did not have notice, actual or constructive, that the funds coming into its account from Salem were actually the property of Variety, then Ark would not be held liable for conversion.[3]

Based on the record we have, evidence of actual notice is scant at best. Variety may have to pursue a constructive notice theory. While articulations of the definition of constructive notice vary in North Carolina case law, this Court has discussed the underlying concept as follows:

> Knowledge of facts which the [party] has or should have had con-
> stitutes notice of whatever an inquiry into such facts would have
> disclosed and is binding on the [party]. Whatever puts a person

---

3. Ark's brief to this Court mentioned in passing the Uniform Commercial Code as another potential defense. Variety argues, and we agree, that the trial court did not address this issue and we need not reach it. However, amicus curiae argues at some length that the UCC precludes the conversion claim here because Ark was a holder in due course. We note in response that all "holder in due course" defenses require that the holder have received the property in good faith, for value, and *without notice. See, e.g.,* N.C.G.S. § 25-3-302(a)(2) (2011). Thus, the analysis would be no different under the UCC—if Ark had no notice, it is immune from liability, but if it did have notice, it is not. Amicus also claims that the UCC preempts the conversion claim entirely as inconsistent with the rights and liabilities created by Article 4A, governing "Funds Transfers." *See id.* § 25-4A-102 cmt. para. 4 (2011). Though North Carolina courts have not addressed this particular issue before, on this argument, we find the Eleventh Circuit's analysis persuasive: "Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained. Therefore, a provision of state law that requires a receiving or beneficiary bank to disgorge funds that it knew or should have known were obtained illegally when it accepted a wire transfer is not inconsistent with the goals or provisions of Article 4A. . . . Interpreting Article 4A in a manner that would allow a beneficiary bank to accept funds when it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for fraudulent activity. It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A." *Regions Bank v. Provident Bank*, 345 F.3d 1267, 1275-76 (11th Cir. 2003).

> on inquiry amounts in law to 'notice' of such facts as an inquiry pursued with reasonable diligence and understanding would have disclosed.

*N. Nat'l Life Ins. Co. v. Lacy J. Miller Mach. Co.*, 311 N.C. 62, 75, 316 S.E.2d 256, 264-65 (1984) (citation omitted). Further, "the question of constructive notice is generally a question for the jury . . . because the conditions are so varying under which the principle will be applied that it is impossible in most cases to declare as matter of law that there is or is not constructive notice." *Foster v. Town of Tryon*, 169 N.C. 233, 235, 169 N.C. 182, 184, 85 S.E. 211, 212 (1915). The record shows numerous conflicts in the forecast evidence regarding what Ark knew or should have known. As such, we conclude that summary judgment is not appropriate on the question of constructive notice here.

### Commingling of Funds

There is one final issue that we must address before concluding our discussion of conversion. Even if the contractual issue and the notice issue are decided in Variety's favor, Ark argues that, as a matter of law, Variety cannot maintain a claim for conversion of money unless the funds in question can be specifically traced and identified. Although this Court has not explicitly so stated, the general rule is that "money may be the subject of an action for conversion only when it is capable of being identified and described." *Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 548 (M.D.N.C. 2002) (citations omitted), *aff'd per curiam*, 58 F. App'x 47 (4th Cir. 2003). Assuming that the jury determines that the Freight Agreement creates an obligation to deliver the money in question—for otherwise, the identification question becomes immaterial—the remaining issue is whether the money can be identified or described. Ark claims that, to satisfy the identification requirement, the specific funds must have been placed in a separate, segregated account or explicitly held in escrow. In effect, Ark argues that the moment the funds were transferred into the Wachovia account and commingled with the deposits of Salem's other customers, they ceased to be identifiable and any conversion claim must fail.

"The requirement that there be earmarked money or specific money capable of identification before there can be a conversion has been complicated as a result of the evolution of our economic system." *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 659-60 (Ala. 2002) (citations and internal quotation marks omitted). Recognizing this reality, numerous courts around the country have adopted rules requiring the specific identification of a sum of money, rather than

**VARIETY WHOLESALERS, INC. v. SALEM LOGISTICS TRAFFIC SERVS., LLC**

[365 N.C. 520 (2012)]

identification of particular bills or coins. *See, e.g., Moore v. Weinberg,* 383 S.C. 583, 589, 681 S.E.2d 875, 878 (2009) ("Money may be the subject of conversion when it is capable of being identified and there may be conversion of determinate sums even though the specific coins and bills are not identified." (citation omitted)); *Campbell,* 842 So. 2d at 660 ("Now, in conversion cases, the courts are not confronted so much with a particular piece of money, i.e., a coin or a bill, but with identified or segregated sources from which money has come or types of accounts into which money has been deposited." (citations and internal quotation marks omitted)).

In the context of this conversion claim, we conclude that funds transferred electronically may be sufficiently identified through evidence of the specific source, specific amount, and specific destination of the funds in question. Other courts confronting this challenge have held similarly.[4] Here Variety has provided evidence of multiple wire transfers of specific sums totaling $887,889.37 from its account to the Wachovia lockbox account. This documentation may be sufficient to meet the identifiable funds requirement and sustain a conversion claim but again, this issue is for the trier of fact to resolve.

Finally, Ark maintains that it no longer has possession of the money in question, having loaned it back to Salem and lost it when Salem went bankrupt. Ark argues that Variety cannot prove that Ark still has the money in question and therefore, cannot recover. If this

---

4. *See, e.g., ADP Investor Commc'n Servs., Inc. v. In House Att'y Servs., Inc.,* 390 F. Supp. 2d 212, 224-25 (E.D.N.Y. 2005) ("ADP alleges . . . that it seeks 'a specifically identifiable sum of money . . . sent by wire transfer from [ADP's] account with JP Morgan Chase in New York to In House's bank account at California Bank & Trust c/o ILCS.' ADP also states the exact amount of the wire transfer, $277,699.89. This Court finds then that ADP properly alleges an identifiable sum of money and therefore ADP's conversion claim does not fail as a matter of law." (second and third alterations in original)); *see also Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc.,* No. 08 C 2561, 2009 WL 3713345, at *9 (N.D. Ill. Nov. 4, 2009) ("For the purposes of this motion, the court assumes the wire transfer fund, which is a specific and documented amount of money ($171,388) transferred to McGrath from an outside source (Creative's account), is sufficiently identifiable to support Creative's conversion claim."); *St. Paul Travelers Cas. & Sur. Co. of Am. v. Manley,* No. 05-cv-01195-REB-BNB, 2006 WL 3019673, at *1 n.2 (D. Colo. Oct. 23, 2006) (unpublished order) ("It thus appears to be the consensus among courts that a claim of conversion is cognizable when it relates to a wire transfer of funds which are traceable to a specific bank account."); *Trey Inman & Assocs. v. Bank of Am.,* 306 Ga. App. 451, 458, 702 S.E.2d 711, 717 (2010) (holding that "$76,122.31 in funds that TIA disbursed to Brookchase Builders via wire transfer was specific and identifiable and therefore was a proper subject for the Bank's conversion claim"); *Mfrs. Hanover Trust Co. v. Chem. Bank,* 160 A.D.2d 113, 125, 559 N.Y.S.2d 704, 712 (1990) (holding funds identifiable where "[plaintiff] effected a wire transfer to [defendant] of a specific sum, $223,280.74, to be credited to a specific account"), *appeal denied by* 77 N.Y.2d 803, 568 N.Y.S.2d 15, 569 N.E.2d 874 (1991).

were the rule, Ark would be completely immunized from liability even for clear and deliberate conversion of funds, simply by the nature of the revolving line of credit. We decline to so hold. Rather, the rule cited numerous times by our Court of Appeals seems appropriate here: " ' "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." ' " *Mace v. Pyatt*, 203 N.C. App. 245, 256, 691 S.E.2d 81, 90 (quoting *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (citations omitted), *disc. rev. denied*, 354 N.C. 363, 557 S.E.2d 538 (2001)), *disc. rev. denied*, 364 N.C. 614, 705 S.E.2d 354 (2010).

### Constructive Trust

[2] Variety's second issue here stems from its claim seeking to have the trial court impose a constructive trust on Ark. We hold that summary judgment was inappropriate on this issue as well. As we did in the discussion of conversion, here we conclude that additional discussion of constructive trust and its secondary issues is warranted, because both the Court of Appeals and the trial court relied on the erroneous assumption that there can be no constructive trust in the absence of a fiduciary relationship. Resolution of this claim on remand will require examination of the issues of notice and possible unconscientious acquisition of the funds, as well as Ark's defense of commingling raised below. We conclude that clarity is best served if we reverse summary judgment and also address what could have been an alternative basis for the summary judgment order.

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970) (citations omitted). The Court of Appeals determined that, because Ark and Variety did not share a fiduciary relationship, there could be no constructive trust. *Variety Wholesalers*, —— N.C. App. at ——, 712 S.E.2d at 364. However, Variety correctly notes that a fiduciary relationship, while generally the basis for constructive trust claims, is not strictly required. In the absence of such a relationship,

Variety faces the difficult task of proving "some other circumstance making it inequitable" for Ark to possess the funds Variety paid to Salem. *Wilson*, 276 N.C. at 211, 171 S.E.2d at 882. We have also used the phrase, "any other unconscientious manner," in describing situations in which a constructive trust may be imposed without a fiduciary relationship. *See Speight v. Branch Banking & Trust Co.*, 209 N.C. 563, 566, 183 S.E. 734, 736 (1936).

It appears unlikely that Ark owed an explicit fiduciary duty to Variety. Lenders do not ordinarily owe fiduciary duties to their borrowers' customers. *See Lassiter v. Bank of N.C.*, 146 N.C. App. 264, 268, 551 S.E.2d 920, 922 (2001) (stating that " '[a] lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party' " (citation omitted)). This makes particular sense here, when Variety admittedly did not know of the existence of Ark until after this litigation began. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citations omitted).

Despite the probable lack of fiduciary duty, if Ark had actual or constructive notice that Salem did not have ownership of the funds deposited in the Wachovia account, Ark's continued acceptance of those funds could be considered unconscientious or inequitable and could thus permit the imposition of a constructive trust. As described earlier, the question of actual or constructive notice here is a genuine issue of material fact. If Ark had notice, actual or constructive, the ultimate decision whether to impose a constructive trust as an equitable remedy would rest in the discretion of the trial court. *See Kinlaw v. Harris*, 364 N.C. 528, 532, 702 S.E.2d 294, 297 (2010) (stating that "[t]rial courts have broad discretion to fashion equitable remedies"); *Sara Lee Corp. v. Carter*, 351 N.C. 27, 37, 519 S.E.2d 308, 314 (1999) (holding that the trial court properly exercised its discretion in ordering imposition of a constructive trust).

### Commingling of Funds

The constructive trust issue involves a similar tracing and identification analysis as is presented in the conversion claim. Ark cites to case law involving constructive trusts and "trust pursuit" doctrine that requires tracing and identification of funds. *See, e.g., Edgecombe Bank & Trust Co. v. Barrett*, 238 N.C. 579, 586, 78 S.E.2d 730, 736 (1953) (stating that "it is a cardinal rule of trust pursuit that the proceeds or the product of the initial property must be traced and identified

through any and all intermediate transfers into the property sought to be reached"). But, *Edgecombe* itself undercuts Ark's strict reading of this requirement, adding that "trust pursuit does not fail where *substantial* identification of the trust property or of the proceeds or product from a conversion thereof, is made." *Id.* (emphasis added) (citations omitted). This Court has also stated that

> "[w]here a trustee so mingles the trust fund or property with his own or so invests it in property together with his own that the trust fund or property cannot be separated or the amount of each ascertained, the whole mixed fund or property becomes subject to the trust except so far as the trustee may be able to distinguish or separate his own, and the burden of making the separation or distinction is on the trustee or his representative, and the rule applies as long as any portion of the fund or property with which the trust fund or property can be traced remains."

*People's Nat'l Bank v. Waggoner*, 185 N.C. 297, 302, 117 S.E. 6, 8 (1923) (citation omitted). Our Court of Appeals has noted the general rule that " 'the act of a trustee in mingling trust funds in a mixed bank account will not destroy their identity so as to prevent their reclamation.' " *Keith v. Wallerich*, 201 N.C. App. 550, 556, 687 S.E.2d 299, 303 (2009) (quoting *Mich. Nat'l Bank v. Flowers Mobile Homes Sales, Inc.*, 26 N.C. App. 690, 694, 217 S.E.2d 108, 111 (1975)). Similarly, we conclude here that Ark may not be immunized from imposition of a constructive trust simply because its lockbox arrangement commingled the funds.

## Conclusion

Because there are genuine issues of material fact to be resolved here, we hold that summary judgment was improper. Accordingly, the trial court also erred in its award of damages to Variety. We reverse the decision of the Court of Appeals and remand this case to that court for remand to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.