Lowder Constr., Inc. v. Phillips, 2019 NCBC 82.

STATE OF NORTH CAROLINA

COUNTY OF RANDOLPH

LOWDER CONSTRUCTION, INC.,

Plaintiff,

v.

RONALD E. PHILLIPS; KEVIN W. GLENN; and ATLANTIC WOOD & TIMBER, LLC,

Defendants.

RONALD E. PHILLIPS,

Counterclaim Plaintiff,

v.

LOWDER CONSTRUCTION, INC. and J. DEAN LOWDER,

Counterclaim Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 686

**ORDER AND OPINION ON DEFENDANT RONALD E. PHILLIPS'S MOTION FOR JUDGMENT ON THE PLEADINGS**

THIS MATTER comes before the Court on Defendant Ronald E. Phillips's Motion for Judgment on the Pleadings. ("Motion," ECF No. 49.)[1]

THE COURT, having considered the Motion, the briefs in support of and in opposition to the Motion, the arguments of counsel at the hearing, the pleadings at

---

[1] Plaintiff voluntarily dismissed its claims against Defendant Kevin W. Glenn (ECF No. 61) and reported to the Court that it settled its claims with Defendant Atlantic Wood & Timber, LLC and that dismissals of those claims would be filed shortly. Therefore, Defendant Atlantic Wood & Timber, LLC's Motion to Dismiss First Amended Complaint (ECF No. 7), Defendant Kevin W. Glenn's Motion for Judgment on the Pleadings (ECF No. 44), Defendant Atlantic Wood & Timber, LLC's Motion for Judgment on the Pleadings (ECF No. 46), and Plaintiff Lowder Construction, Inc.'s Motion to Dismiss Defendant Atlantic Wood & Timber, LLC's Counterclaim (ECF No. 38), which were filed in and around the same time as the Motion and briefed and argued by the parties, are DENIED as MOOT. Lowder Construction, Inc.'s Motion to Dismiss the Sixth Amended and Supplemental Counterclaim filed by Defendant Ronald E. Phillips (ECF No. 39) will be addressed by separate order.

issue, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part.

*Roberson, Haworth & Reese, PLLC, by Christopher C. Finan, Esq. for Plaintiff Lowder Construction, Inc.*

*David E. Shives, PLLC, by David E. Shives, Esq. for Defendant Ronald E. Phillips.*

McGuire, Judge.

## I.     FACTS[2] AND PROCEDURAL BACKGROUND

1.     Plaintiff Lowder Construction, Inc. ("LCI") is a North Carolina corporation with its principal place of business in Randolph County, North Carolina. LCI is a turnkey framing contractor that frames commercial structures such as apartment buildings, student housing, and other multi-family residential buildings.

2.     Defendant Ronald E. Phillips ("Phillips") is a citizen and resident of North Myrtle Beach, South Carolina, and a former independent contractor of LCI. Phillips is employed with Atlantic Wood & Timber, LLC ("Atlantic").

3.     Defendant Kevin W. Glenn ("Glenn") is a citizen and resident of Gaston County, North Carolina, and a former employee of LCI.  Glenn is employed with Atlantic.

4.     Defendant Atlantic Wood & Timber, LLC ("Atlantic") is a North Carolina limited liability company with its principal place of business in Mecklenburg County, North Carolina.  Atlantic is a competitor of LCI.

---

[2] The facts cited herein are drawn from the First Amended Complaint.  ("FAC," ECF No. 4.)

## A.    LCI's Trade Secrets

5.    LCI regularly competes with other commercial framing companies in submitting bids for framing work projects. (ECF No. 4, at ¶ 7.) To gain a competitive advantage and grow its business, LCI has made a significant investment in automating and refining its pricing and bidding process. (*Id.* at ¶ 10.)

6.    LCI "independently created and developed a unique, proprietary method, process and technique . . . to quickly and accurately develop, generate and prepare for submission to prospective clients, full and complete three-dimensional structural renderings of proposed Projects" (the "Structural Model"). (*Id.* at ¶ 11.) LCI alleges that "[t]he Structural Model, . . . consist[s] of a significant amount of specially-purposed and customized software." (*Id.* at ¶ 16.)

7.    One of the benefits of the Structural Model is that the three-dimensional structural rendering allows LCI to identify any potential problems in its proposed projects, permitting LCI to integrate any issues into its pricing. (*Id.* at ¶ 13.) Additionally, the Structural Model automatically generates "material takeoffs," a full, complete, and accurate list of all necessary materials to complete a proposed project. LCI alleges that this gives it a significant, commercially-valuable advantage because LCI's competitors routinely generate "material takeoffs" manually, a time-consuming and inaccurate process. (*Id.* at ¶ 15.)

8.    LCI also maintains a specific list of customers and potential customers, including pricing information relating to its services, and key contact persons associated with customers and potential customers, along with "commercially-

sensitive and confidential pricing information relating to the services it provides, and . . . direct solicitations from potential customers" (the "Customer Data"). (*Id.* at ¶ 22.)

9. Lastly, LCI maintains other proprietary business data, including "cost histories, bid and pricing policies, operating margins and profits, sales and marketing strategies, vendor pricing and relationship histories, and other confidential business information [(the 'Business Data')]." (*Id.* at ¶ 23.)

10. LCI alleges that the Structural Model, Customer Data, and Business Data (collectively, the "Trade Secrets") are trade secrets owned by LCI. (*Id.* at ¶ 24.)

11. LCI's Trade Secrets are known only to a few designated LCI employees and/or independent contractors. (*Id.* at ¶¶ 19, 26.) As additional security measures, LCI retains hardware ownership and uses "permission-restricted access on a need-to-know basis, and confidentiality policies and/or agreements." (*Id.* at ¶ 27.)

**B. Phillips's and Glenn's work for LCI**

12. In January 2014, LCI retained Phillips as an independent contractor. Phillips was tasked with assisting LCI in sales and marketing and improving LCI's operations. (*Id.* at ¶ 29.)

13. On August 11, 2014, LCI and Phillips entered into a written consulting agreement (the "Phillips Agreement"), which included provisions governing compensation and LCI's confidential and proprietary information. (*Id.* at ¶ 31.) LCI alleges that under the terms of the Phillips Agreement:

    a. [LCI] paid, and Defendant Phillips accepted, a 'Gross Margin' bonus of $195,273.00, for the calendar year 2015. Said 'Gross Margin' bonus was paid in two installments—

$48,357.00 on or about September 16, 2015, and $146,916.00 on or about March 16, 2016.

b.  However, subsequent corrections and restatements of [LCI]'s financial statements for 2015 revealed that the amount of the foregoing bonus was, in fact, too great, and that the same should properly have totaled only $140,808.00.

c.  Accordingly, pursuant to the terms of the Phillips Agreement, Defendant Phillips properly owes [LCI] the total sum of $54,465.00.

d.  [LCI] has fully-paid Defendant Phillips all amounts due him under the terms and conditions of the Phillips Agreement.

(*Id.* at ¶¶ 34–36, 38.)  Phillips denies that he was overpaid any bonuses.

14.  The Phillips Agreement terminated on February 14, 2016.  However, Phillips continued to be associated with LCI as an independent contractor, and the parties continued to act in conformity with the Phillips Agreement.  (*Id.* at ¶¶ 37, 40, 41.)  In November 2016, Phillips and LCI entered into an oral agreement that was identical to the Phillips Agreement except for the terms relating to Phillips's compensation.  (*Id.* at ¶¶ 44–45.)

15.  LCI hired Glenn as an employee in August 2014 to assist in diversifying LCI's business.  (*Id.* at ¶ 50.)

16.  LCI alleges that Phillips and Glenn were the only two employees and/or independent contractors whose duties "focused, to a significant degree, on the creation, development and implementation of the Structural Model" and who "had significant, direct and unfettered access to all constituent components—both tangible and intangible—of the Structural Model."  (*Id.* at ¶¶ 54–55.)  While employed with

LCI, Phillips and Glenn created renderings using the Structural Model for specific proposed projects and presented them to clients and prospective clients. (*Id*. at ¶¶ 59–60.)

17. The Structural Model resided solely on a secure computer purchased by LCI for Glenn's use (the "Computer"). (*Id*. at ¶ 55.) The Computer was not accessible by outside parties and Glenn and Phillips "had sole possession of the tangible components" of the Structural Model. (*Id*. at ¶ 120.)

## C. Phillips's and Glenn's alleged sabotage of LCI projects

18. In approximately the summer of 2017, a disagreement arose between LCI and Glenn and Phillips regarding the continued development and implementation of the Structural Model. (*Id*. at ¶ 62.) At the conclusion of a heated discussion between LCI's president and Phillips regarding the Structural Model, Phillips closed the conversation by telling LCI's president, "I'll fix this." (*Id*. at ¶ 63.)

19. LCI alleges that thereafter "Glenn and/or [ ] Phillips prepared and/or were requested to prepare and finalize several actual 'structural models,' purportedly utilizing [LCI]'s Structural Model to do so." (*Id*. at ¶ 65.) Several of these structural models contained significant inaccuracies, and LCI only discovered after constructing the projects for its customers that the structural models "grossly-underestimated the actual costs necessary to complete the [p]rojects." (*Id*. at ¶¶ 66–67.) The inaccuracies caused LCI to significantly underbid the projects, which substantially impacted LCI's profits. (*Id*. at ¶ 68.) LCI alleges Phillips and Glenn intentionally underestimated the costs "with the specific intent to cause material harm to" LCI. (*Id*. at ¶ 73.)

### D. Atlantic hires Phillips and Glenn

20. Prior to September 2017, Atlantic was primarily a "labor only" contractor; Atlantic would provide the labor to perform the framing, but the framing materials would have to be purchased separately. (*Id.* at ¶ 76.) Atlantic then sought to expand into providing "turnkey" framing services similar to those provided by LCI. (*Id.* at ¶ 77.)

21. In September 2017, Phillips and Glenn began discussing potential employment with Atlantic. (*Id.* at ¶ 79.) During these discussions, Glenn, at Phillips's request, provided Atlantic with one of LCI's "structural models." (*Id.*)

22. In October 2017, Atlantic communicated to Phillips and Glenn that it was "'**all in**' on the acquisition and use of the Structural Model as a means to expand its 'turnkey' business." (*Id.* at ¶ 82 (emphasis in original).) In November 2017, Atlantic discussed employment terms with Phillips and Glenn, including paying them a bonus for two projects on which they were working for LCI that they would bring "in hand" to Atlantic after they left LCI. (*Id.* at ¶ 83.)

23. In early December 2017, unbeknownst to LCI, Phillips and Glenn accepted employment with Atlantic. (*Id.* at ¶ 84.) LCI alleges that Phillips and Glenn, while still employed by LCI, performed work for Atlantic with respect to a bid proposal for a project on which LCI was also bidding: the Overture Centennial project offered by Greystar Real Estate Partners. (*Id.*) Atlantic then "wrongfully obtained from [Phillips and Glenn] a copy of the [Structural Model LCI] prepared for the Overture Centennial project." (*Id.* at ¶ 96.)

24.     On December 21, 2017, Phillips ended his association with LCI, and on December 22, 2017, LCI terminated Glenn's employment. (*Id.* at ¶¶ 85–86.) Phillips and Glenn were immediately hired by Atlantic, and shortly thereafter began working for Atlantic. (*Id.* at ¶ 87.)

25.     LCI alleges that:

a.     Prior to the termination of their employment with [LCI] . . ., Defendants Glen [sic] and Phillips misappropriated [LCI]'s Trade Secrets by accessing and taking the Trade Secrets in physical and/or electronic form.

. . .

b.     Upon information and belief, Atlantic intended to misappropriate [LCI]'s Trade Secrets, including without limitation the Structural Model, for the purpose of carrying out a plan, reached with and led by Defendants Glenn and Phillips, to undercut [LCI]'s bids on current and upcoming projects, and thereby acquire [LCI]'s largest and most profitable customers for the dual purpose of crippling [LCI]'s ability to compete and immediately establishing Atlantic as a competitive 'turnkey' framing contractor for large, complex commercial structures in the Carolinas.

c.     Upon information and belief, since hiring Defendants Glenn and Phillips, Atlantic has misappropriated [LCI]'s Trade Secrets to acquire large project contracts from [LCI]'s most important and critical customers, thereby harming [LCI]'s ability to compete and allowing Atlantic to immediately establish an expanded and more prominent presence in the Carolinas without expending the time, money, and resources that would have been required had Atlantic not misappropriated [LCI]'s Trade Secrets.

d.     Specifically, since hiring Defendants Glenn and Phillips, upon information and belief Atlantic has used [LCI]'s Trade Secrets to obtain contracts for at least two (2) large commercial 'turnkey' framing jobs from key existing [LCI] customers—The Preserve at Mountain Island (by Blue

Ridge Companies) and Hazel SouthPark (by CBG Building Company).

    e.    But for Atlantic's wrongful conduct described above, including without limitation its misappropriation of [LCI]'s Trade Secrets, [LCI] would have been awarded and agreed to enter into both of these contracts with its longtime existing customers.

(*Id*. at ¶¶ 89, 91–94.)

26.    LCI further alleges that Atlantic intended "to acquire [LCI]'s Trade Secrets and cripple its ability to compete with Atlantic for 'turnkey' framing projects." (*Id*. at ¶ 96.) Additionally, LCI alleges that the "Structural Model remains solely in the possession of the Defendants." (*Id*. at ¶ 98.)

**E.    Relevant procedural history**

27.    LCI initiated this action by filing its Complaint on April 18, 2018. (ECF No. 3.) On March 14, 2019, LCI filed the Amended Complaint. (ECF No. 4.) In the Amended Complaint, LCI alleges claims against Phillips for: a declaratory judgment that it overpaid bonuses to Phillips (First Claim); misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, N.C.G.S. §§ 66-152 *et seq.* ("NCTSPA") (Second Claim); conversion (Third Claim); tortious interference with prospective economic advantage (Fifth Claim); civil conspiracy (Sixth Claim); unfair or deceptive trade practices in violation of N.C.G.S. § 75-1.1 ("UDTPA") (Seventh Claim); punitive damages (Eighth Claim); and injunctive relief (Ninth Claim). (ECF No. 4, at ¶¶ 106–63.)

28.    Phillips filed an Answer and Counterclaim on June 17, 2019. (ECF No. 33.)

29. On August 16, 2019, Phillips filed the Motion. Phillips simultaneously filed a brief in support of the Motion. (ECF No. 50.)

30. LCI filed a memorandum in opposition to the Motion on September 9, 2019. (ECF No. 53.) On September 19, 2019, Phillips filed a reply brief in support of the Motion. (ECF No. 58.)

31. The Court held a hearing on the Motion on September 25, 2019, at which counsel for the parties made oral arguments.

32. The Motion has been fully briefed and argued, and is now ripe for determination.

## II. ANALYSIS

33. "A motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain. When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant[.]" *Bigelow v. Town of Chapel Hill*, 227 N.C. App. 1, 3, 745 S.E.2d 316, 319 (2013) (citation omitted).

34. The Court may only consider "the pleadings and exhibits which are attached and incorporated into the pleadings." *Davis v. Durham Mental Health / Dev. Disabilities / Substance Abuse Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004) (citation omitted). The Court must "view the facts and permissible

inferences in the light most favorable to the nonmoving party." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "A party who moves for judgment on the pleadings admits two things: (1) the truth of all well-pleaded facts in the non-movant's pleading, together with all permissible inferences to be drawn from such facts; and (2) the untruth of his own allegations in so far as they are controverted by the non-movant's pleading." *Hedrick v. Rains*, 121 N.C. App. 466, 468, 466 S.E.2d 281, 283 (1996). "All well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (internal citations omitted).

35.     Phillips seeks judgment on the pleadings as to each of LCI's claims against him. The Court will address these claims in turn.

   *A.     Declaratory Judgment*

36.     LCI's first claim against Phillips seeks a declaratory judgment "that no further sums whatsoever are owed by [LCI] to Defendant Phillips, pursuant to the Phillips Agreement, the 2016 Agreement, or otherwise." (ECF No. 4, at ¶ 114.) LCI also requests that "pursuant to the terms and conditions of the then-in-effect Phillips Agreement, the Court should properly enter its judgment against Defendant Phillips in the amount of $54,465.00 in regard to the 2015 calendar year 'Gross Margin' bonus overpayment made to Defendant Phillips by [LCI]." (*Id.* at ¶ 115.)

37. Under North Carolina law, a declaratory judgment is a statutory remedy that grants a court the authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. N.C.G.S. § 1-253; *Town of Pine Knoll Shores v. Carolina Water Serv.*, 128 N.C. App. 321, 321, 494 S.E.2d 618, 618 (1998). The Court may, by declaratory judgment, "determine[ ] any question of construction or validity" and declare "rights, status, and other legal relations" under a written contract. N.C.G.S. § 1-254. An actual controversy between the parties must exist at the time the complaint is filed in order for the court to have jurisdiction to render a declaratory judgment. *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 584–85, 347 S.E.2d 25, 29 (1986).

38. Phillips argues that LCI fails to allege facts sufficient to support the claim for a declaratory judgment. (ECF No. 50, at pp. 7–9.) The Court disagrees. LCI alleges that it paid Phillips a 2015 bonus greater than that to which he was entitled under the Phillips Agreement, and seeks a declaration regarding the alleged overpayment. Phillips denies that LCI overpaid any bonus amounts to him or that he is liable for repaying any amounts to LCI. There exists an actual controversy between the parties, and the facts are in dispute.

39. Therefore, to the extent that the Motion seeks judgment in Phillips's favor on the claim for declaratory judgment, the Motion should be DENIED.

B. *Misappropriation of Trade Secrets*

40. LCI alleges the Structural Model, Customer Data, and Business Data are trade secrets within the meaning of the NCTSPA and that Phillips

misappropriated those trade secrets. (ECF No. 4, at ¶¶ 116–124.) Phillips contends that LCI's allegations do not support the claim that the Structural Model, Customer Data, and Business Data are trade secrets. (ECF No. 50, at pp. 9–15.)

41. The standards for pleading a claim for misappropriation of trade secrets under the NCTSPA are well-established. *See County of Wayne Constr. Managers of Goldsboro v. Amory*, 2019 NCBC LEXIS 32, at *18–23 (N.C. Super. Ct. May 17, 2019). The Supreme Court of North Carolina recently reiterated that a plaintiff "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547–48 (2018) (citations omitted).

42. Phillips argues that the Structural Model is nothing more than a combination of commercially available software programs and cannot be a trade secret. (ECF No. 50, at pp. 9–13.) However, LCI alleges that it "independently *created and developed a unique, proprietary method, process and technique* – utilizing, among other things, a unique set of software tools – to quickly and accurately develop, generate and prepare for submission to prospective clients, full and complete three-dimensional structural renderings of proposed Projects [the 'Structural Model']." (ECF No. 4, at ¶ 11 (emphasis added).) LCI further alleges that "the Structural Model automatically generates full, complete, and accurate 'material takeoffs' – full, complete, and accurate listings of all materials necessary to complete a given prospective Project." (*Id.* at ¶ 15.) LCI alleges that material takeoffs are routinely

performed manually within the industry and, consequently, "the process of generating 'material takeoffs' is an inherently time-consuming and necessarily-inaccurate process." (*Id.*)

43.     LCI alleges that the Structural Model provides LCI "unique benefits," and "a significant, commercially-valuable advantage." (*Id.* at ¶¶ 13–14.) LCI summarizes by alleging that the Structural Model is not merely the software, but a "specially developed process and method by which the various software tools are utilized to generate both the three-dimensional structural models and highly-accurate 'material takeoffs.'" (*Id.* at ¶ 16.) The Court concludes that these allegations sufficiently allege that the Structural Model contains proprietary features that are competitively advantageous to LCI to survive the Motion.

44.     Phillips further argues that LCI has not alleged that it took reasonable measures to protect the Structural Model. (ECF No. 50, at pp. 12–13.) The Court, however, concludes that LCI's allegations regarding the security measures to protect the Structural Model, while thin, are sufficient to survive a motion for judgment on the pleadings. "Generally, only where efforts to maintain secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the [pleadings] stage." *Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *14 (N.C. Super. Ct. Oct. 21, 2016).

45.     Phillips also contends that LCI's allegations do not support the claim that the Customer Data and Business Data are trade secrets because the information

contained therein was vaguely described and is publicly available. (ECF No. 50, at pp. 13–14.)

46.    To the extent that the Customer Data and Business Data constitute trade secrets, they would have to be "compilation[s] of information." N.C.G.S. § 66-152(3). "[I]n some instances, a trade secret can be found if the information or process has particular value as a compilation or manipulation of information, even if the underlying information is otherwise publicly available. Whether a compilation or manipulation of information deserves trade secret protection depends on several factors, including the difficulty with which the information could be gathered, compiled, or manipulated." *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *32 (N.C. Super. Ct. Feb. 18, 2016); *see also Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015) ("A compilation of publicly available information may, however, receive trade secret protection where the claimant encountered some difficulty in assembling each of the public components.").

47.    Again, while the allegations are minimal, the Court concludes that LCI's allegations regarding its Customer Data satisfy the burden of alleging the nature of its trade secret with "sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609, 811 S.E.2d at 547–48. LCI alleges that the Customer Data is "a highly-specific list of customers and potential customers" compiled with "commercially-sensitive and confidential

pricing information relating to the services it provides," and can contain information about "direct solicitations from potential customers not generally known to the public." (ECF No. 4, at ¶ 22.) This goes beyond mere allegations of customer identities and contact information and includes information that could be valuable to a competitor of LCI.

48. LCI alleges that its Business Data consists of "proprietary data and information in the conduct of its business, including without limitation cost histories, bid and pricing policies, operating margins and profits, sales and marketing strategies, vendor pricing and relationship histories, and other confidential business information." (*Id.* at ¶ 23.) This also describes private information that could be considered, in compilation, a trade secret.

49. Finally, LCI alleges that Phillips acquired and used trade secret information regarding specific projects for which LCI was bidding—The Preserve at Mountain Island (by Blue Ridge Companies) and Hazel SouthPark (by CBG Building Company)—to help Atlantic win those projects. (*Id.* at ¶ 93.) This allegation is highly specific and can leave no doubt as to the information that LCI claims Phillips misappropriated.

50. LCI sufficiently pleads its claim for misappropriation of trade secrets to survive Phillips's challenge, and to the extent the Motion seeks judgment in Phillips's favor on the claim for misappropriation of trade secrets in violation of the NCTSPA, the Motion should be DENIED.

### C.   Conversion

51.   LCI attempts to repackage its misappropriation of trade secrets claim as a claim for common law conversion. (ECF No. 4, at ¶¶ 125–31.) Phillips moves for judgment on the pleadings on LCI's conversion claim, arguing that "LCI fails to allege that it has been deprived of the possession or use of its Structural Model, Customer Data, or Business Data." (ECF No. 50, at p. 15.) The Court agrees with Phillips as to the Customer Data and Business Data, but not as to the Structural Model.

52.   Under North Carolina law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (citation omitted). There are two elements in a claim for conversion: (1) the plaintiff's ownership and (2) the defendant's wrongful possession. *Id.*

53.   "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (citation omitted). "[R]etention by a wrongdoer of an electronic copy in a manner that does not deprive the original owner of access to the same electronic data cannot constitute conversion under current North Carolina law." *Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co.*, 2018 NCBC LEXIS 2, at *36 (N.C. Super. Ct. Jan. 2, 2018); *see also New Friendship Used Clothing Collection, LLC*

*v. Katz*, 2017 NCBC LEXIS 72, at \*38–39 (N.C. Super. Ct. Aug. 18, 2017) ("[M]erely making a copy of, as opposed to deleting, electronically stored information does not support a conversion claim because the owner is not deprived of possession or use of the information.").

54.    While LCI alleges that Phillips took its Business Data and Customer Data, *inter alia*, "by accessing and taking [the data] in physical and/or electronic form," LCI does not allege that it no longer has access, or that it has been deprived of access, to the data. (ECF No. 4, at ¶ 89.)

55.    On the other hand, LCI alleges that since the separation of Phillips and Glenn from LCI, the "Structural Model remains solely in the possession of the Defendants." (*Id*. at ¶ 98.) The Court is satisfied that, read in the light most favorable to LCI, it has alleged that it has been deprived of access to the Structural Model.

56.    Therefore, to the extent the Motion seeks judgment in Phillips's favor on the claim for conversion regarding the Structural Model, the Motion should be DENIED. However, to the extent the Motion seeks judgment in Phillips's favor on the claim for conversion regarding the Customer Data and Business Data, the Motion should be GRANTED.

D.    *Tortious Interference with Prospective Economic Advantage*

57.    LCI alleges that Defendants, including Phillips, interfered with its potential acquisition of contracts with its customers. (ECF No. 4, at ¶¶ 140–46.) In support of its claim, LCI alleges, *inter alia*:

  a.    The Defendants knowingly, intentionally, and without privilege, justification, or excuse induced [LCI] customers

to cease using [LCI] on certain 'turnkey' commercial framing projects and to award those projects to Atlantic instead.

b. At minimum, the Defendants' wrongful actions specifically induced Blue Ridge Companies to enter into a framing contract with Atlantic, and not with [LCI], for its Preserve at Mountain Island project, and specifically induced CBG Building Company to enter into a framing contract with Atlantic, and not with [LCI], for its Hazel SouthPark project.

c. Based on the nature and length of its existing business relationship with both companies, [LCI]'s own bid history with both companies, and the terms of other submitted bids, at least these two (2) contracts would in fact, upon information and belief, have been awarded to and accepted by [LCI], but for the Defendants' wrongful conduct.

(*Id.* at ¶¶ 141–43.)

58. The Supreme Court of North Carolina recently reaffirmed that the tort of interference with prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights. However, a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim. Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (internal quotation marks and citations omitted).

59. "Stating a claim for tortious interference with prospective economic advantage requires that the plaintiff 'allege facts [ ] show[ing] that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them[,] which contract would have ensued but for the interference.'" *Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods.*, 831 S.E.2d 395, 403 (N.C. Ct. App. 2019) (citing *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (1999)). "Interference with a contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Beverage Sys. of the Carolinas, LLC*, 368 N.C. at 700, 784 S.E.2d at 462 (internal quotation marks and citation omitted). On the other hand, "'[i]nterference is without justification if it is 'malicious and wanton[.]'" *Alcorn v. Bland*, No. COA12-613, 2012 N.C. App. LEXIS 1416, at \*21 (Dec. 18, 2012) (citing *Coleman v. Whisnant*, 225 N.C. 494, 506, 35 S.E.2d 647, 655 (1945)).

60. Phillips's very short argument in support of dismissal of the claim for tortious interference is hard to follow. (ECF No. 50, at pp. 16–17.) It appears that Phillips contends that LCI does not allege that, to the extent Phillips interfered with LCI's prospective contracts for the Preserve at Mountain Island and Hazel SouthPark projects, he acted maliciously or "without justification." (*Id.*)

61. LCI makes no argument in response to Phillips's motion for judgment on the claim for tortious interference with prospective economic advantage. Nevertheless, LCI alleges that Phillips interfered, in part, "for the [ ] purpose of crippling [LCI]'s ability to compete." (ECF No. 4, at ¶¶ 91, 96.) Considering the

allegations in the FAC and the inferences therefrom in the light most favorable to LCI, *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499, the Court concludes that LCI has adequately alleged that Phillips acted without justification in interfering with LCI's prospective contracts.

62. Therefore, to the extent the Motion seeks judgment in Phillips's favor on the claim for tortious interference with prospective economic advantage, the Motion should be DENIED.

### E. Civil Conspiracy

63. LCI alleges that Phillips took part in a civil conspiracy with the other Defendants and "agreed to act, and in fact did act, in concert and conjunction with one another in engaging in the wrongful and unlawful conduct complained of by [LCI] hereinabove, all in furtherance of their conspiracy." (ECF No. 4, at ¶ 148.) Phillips argues that "'[t]here is no independent cause of action for civil conspiracy. A claim for conspiracy is dependent on 'an underlying claim for unlawful conduct.'" (ECF No. 50, at p. 17 (quoting *Sellers v. Morton*, 191 N.C. App. 75, 83, 661 S.E.2d 915, 922 (2008)).) Phillips contends he is entitled to judgment in his favor because "LCI has failed to allege any such claim against Phillips." (*Id.*)

64. Phillips's argument that LCI has not alleged claims for unlawful conduct against Phillips is, of course, incorrect. The Court already has concluded that LCI states claims against Phillips for misappropriation of trade secrets and tortious interference with prospective economic advantage. Accordingly, to the extent the

Motion seeks judgment in Phillips's favor on the claim for civil conspiracy, the Motion should be DENIED.

F. *UDTPA Claim*

65. LCI claims Phillips's conduct constitutes unfair or deceptive trade practices in violation of the UDTPA. (ECF No. 4, at ¶¶ 153–56.) The entirety of Phillips's argument in his brief in opposition to the Motion is as follows:

> LCI's . . . claim for unfair [or] deceptive trade practices is entirely premised on an insufficient claim of misappropriation of trade secrets. Where a violation of the UDTPA is based on a claim for tortious interference with contract or misappropriation of trade secrets – or any other claim – for which the plaintiff has failed to state a claim for relief, the UDTPA claim also fails. *Krawiec*, 370 N.C. at 613, 811 S.E.2d at 550. Phillips is therefore entitled to judgment in its favor on LCI's claim under the UDTPA.

(ECF No. 50, at p. 17.)

66. As stated above, the Court concludes that LCI has sufficiently alleged claims against Phillips for misappropriation of trade secrets and tortious interference. Accordingly, to the extent the Motion seeks judgment in Phillips's favor on the claim for violation of the UDTPA, the Motion should be DENIED.

G. *Punitive Damages and Injunctive Relief*

67. With regard to LCI's cause of action in the FAC labeled "Punitive Damages" (ECF No. 4, at ¶¶ 157–59), Phillips argues only that LCI has failed to state a claim against Phillips that would support an award of punitive damages. (ECF No. 50, at pp. 17–18 (citing *Watson v. Dixon*, 352 N.C. 343, 348, 532 S.E.2d 175, 178 (2000) (Under the statute, "[p]unitive damages may be awarded only if the claimant proves

that the defendant is liable for compensatory damages.")).) The Court already has concluded that Phillips alleges claims that would support an award of punitive damages. *See* N.C.G.S. § 66-154(c) (Punitive damages can be awarded for misappropriation of trade secrets if "willful and malicious misappropriation exists."). To the extent the Motion seeks judgment in Phillips's favor on the claim for punitive damages, the Motion should be DENIED.

68.     Phillips also argues that LCI's claim labeled "Injunctive Relief" (ECF No. 4, at ¶¶ 160–63) should be dismissed because it is a "remed[y], not [an] independent cause[ ] of action." (ECF No. 50, at p. 18 (citing *Brewster v. Powell Bail Bonding, Inc.*, 2018 NCBC LEXIS 76, at *18–19 (N.C. Super. Ct. July 26, 2018)).) Since LCI has stated viable claims against Phillips, the Court concludes it is premature to dismiss the claim for injunctive relief. To the extent the Motion seeks judgment in Phillips's favor on the claim for injunctive relief, the Motion should be DENIED.

III.    CONCLUSION

THEREFORE, IT IS ORDERED that:

69.     To the extent Phillips seeks judgment in his favor as to LCI's claim for conversion of the Customer Data and Business Data, the Motion is GRANTED, and LCI's claim is dismissed with prejudice.

70.     Except as expressly granted herein, the Motion is DENIED.

SO ORDERED, this the 30th day of December, 2019.

                 /s/ Gregory P. McGuire

                 Gregory P. McGuire
                 Special Superior Court Judge
                 for Complex Business Cases