IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-593

Filed 18 March 2026

Sampson County, No. 23CVS000519-810

ANGELICA LOPEZ FIGUEROA, JEDIAEL VENTURA SANTIAGO, AND ALBERTANO LOPEZ, Plaintiffs,

v.

HUMBERTO MONSIVAIS II, AMBER MONSIVAIS a/k/a AMBER EDGE, BYRD FARMS, INC., NORTH CAROLINA DIVISION OF MOTOR VEHICLES, A DIVISION OF THE NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, Defendants.

Appeal by plaintiffs from orders entered 10 December 2024 and 11 March 2025 by Judges James Gregory Bell and Matthew T. Houston, respectively, in Sampson County Superior Court. Heard in the Court of Appeals 11 February 2026.

*North Carolina Justice Center, by Katharine B. Woomer-Deters, for plaintiffs-appellants.*

*Jones and Jones, P.L.L.C., by Cecil B. Jones, for defendant-appellee Byrd Farms, Inc.*

*No brief filed for defendants-appellees Monsivais.*

FLOOD, Judge.

Plaintiffs Angelica Lopez Figueroa, Jediael Ventura Santiago, and Albertano Lopez (collectively, "Plaintiffs") appeal from the trial court's orders granting summary judgment in favor of Defendant Byrd Farms, Inc., and entering default judgment against Defendants Humberto Monsivais II and Amber Monsivais. On

appeal, Plaintiffs argue the trial court erred by failing to: first, grant Plaintiffs a constructive trust; second, grant Plaintiffs a resulting trust; third, quiet title to the real property at issue in Plaintiffs' names; fourth, enter declaratory judgment in Plaintiffs' favor; and fifth, quiet title to the mobile homes at issue in Plaintiffs' names. Upon careful review, we conclude the trial court did not abuse its discretion by not awarding a constructive trust to Plaintiffs as against Defendants Monsivais, but that summary judgment was erroneously granted where there is a genuine issue of material fact as to whether Defendant Byrd Farms paid fair consideration; thus, we affirm in part and reverse and remand in part for further findings of fact.

## I. <u>Factual and Procedural Background</u>

This appeal involves a situation where multiple parties purchased the same piece of land, or parts thereof, from the same person.

Defendant Humberto Monsivais II owned land on Hayne Stretch Road in Autryville, North Carolina. Specifically, Defendant Humberto owned a single parcel, divided into two portions: the 1107 Hayne Stretch Road portion ("the 1107 Property"), which is a portion of the parcel with an unattached mobile home on it, and the 1125 Hayne Stretch Road portion ("the 1125 Property"), which is another portion of the parcel that has an unattached mobile home and small cinderblock house on it.

### *The 1107 Property*

In August 2021, Plaintiffs Figueroa and Santiago entered into a contract with Defendant Humberto and his wife, Amber Monsivais, to purchase the 1107 Property

for $18,000.00. The contract required Plaintiffs to pay a $15,000.00 "down payment," which Plaintiffs paid. Plaintiffs were then required to pay $500.00 per month until the home was paid off, at which time title would be transferred. The contract was notarized but was not recorded.

Plaintiffs Figueroa and Santiago renovated the 1107 Property and moved in with their two young children in February 2022. Plaintiffs Figueroa and Santiago made all of their payments except the final payment, about which they then communicated to Defendant Humberto in January 2022 that they "were ready and willing to make[,] . . . but that [they] wanted title to the home[.]"

### The 1125 Property

In November 2021, only a few months after Defendants Monsivais entered into a contract for the 1107 Property, Plaintiff Lopez, a family member of Plaintiffs Figueroa and Santiago, entered into a contract with Defendant Humberto to purchase the 1125 Property for $30,000.00. This contract was notarized by a public notary but was not recorded. Plaintiff Lopez paid $30,000.00 in total shortly after entering the contract, but Defendant Humberto did not convey title.

### Defendant Byrd Farms, Inc.

Around September 2022, Defendant Humberto contacted Scott Byrd, owner of Defendant Byrd Farms, Inc., asking him to buy the Hayne Stretch Road parcel, which includes both the 1107 and 1125 properties. On 7 October 2022, Defendant Byrd Farms and Defendant Humberto entered into an Offer to Purchase and Contract. The

contract provided that the purchase price was $21,500.00; however, a line was drawn through this number and rewritten to be $15,000.00, with Mr. Byrd's and Defendant Humberto's signed initials beside the change.

According to Mr. Byrd's deposition, they changed the purchase price several times after Defendant Humberto asked him for money on multiple occasions. Mr. Byrd explained that Defendant Humberto "was so desperate to just make ends meet at that period of time in his life where his wife had kicked him out and he didn't have his clothes[,]" so they lowered the purchase price and agreed that Defendant Humberto would be able "to stay in the brown single-wide for three years."

He further explained that, on 22 November 2022, he and Defendant Humberto also signed another document—handwritten—that said: "[Defendant] Humberto Monsivais has sold two mobile homes to [Defendant] Byrd Farms that sit on approximately 1.8 acres of land at 1125 Hayne Stretch. Sale price, $10,000.00. These mobile homes are included with land/deed to [Defendant] Byrd Farms[.]" Mr. Byrd testified that he did not know if that document was necessarily a bill of sale for just the mobile homes or the land: "I don't know. It's for all – it was for all that he was willing to convey. I wanted the mobile homes and the land, but I don't know what I got." Afterward, however, Defendant Humberto "kept badgering" Mr. Byrd, contending Mr. Byrd did not "pay the full amount[.]" The two argued, with Mr. Byrd explaining that Defendant Humberto had not yet "give[n] the titles to the mobile home[s.]" Mr. Byrd finally said: "I'll give you $2,000 and I'm never going to get

anything from it but it's the end of it and you can sign that it's – even though it was already for the mobile homes here, there's one explicitly just for the mobile homes." The $2,000.00 check was paid somewhere "between . . . November 22 and . . . November 30, 2022[.]"

On 28 November 2022, Defendant Humberto executed a general warranty deed transferring the 1107 Property and the 1125 Property to Defendant Byrd Farms.

### *Lawsuit*

On 26 May 2023, Plaintiffs filed a complaint against Defendants Monsivais, Defendant Byrd Farms, and the Department of Motor Vehicles ("Defendant DMV"). In their complaint, Plaintiffs brought claims of unfair and deceptive trade practices and fraud in the inducement against Defendant Humberto; claims of breaches of contract and of implied covenant of good faith and fair dealing against Defendants Monsivais; and claims for the impositions of a resulting trust or constructive trust against Defendant Humberto and Defendant Byrd Farms.[1] Plaintiffs further requested the trial court enter declaratory judgment in their favor, recording and titling the properties in their names. Plaintiffs further sought to quiet title on the mobile homes, contending the homes were separate property as registered with

---

[1] We note here, however, that a constructive trust "is a remedy, not a cause of action, and is merely a procedural device by which a court of equity may rectify certain wrongs." *Musselwhite v. Cheshire*, 266 N.C. App. 166, 181 (2019).

Defendant DMV.[2]

Defendant Byrd Farms filed a motion to dismiss pursuant to Rule 12(b)(6), contending that "[t]he complaint shows upon its face that neither of the contracts were recorded at the Register of Deeds Office or with the Clerk of Superior Court such as to provide any legal notice of any claims Plaintiffs might have to said property as to a third party purchaser[,]" and thus, Plaintiffs "have no legal basis." Defendant Byrd Farms submitted a memorandum of law with its motion to dismiss, arguing that, even if Defendant Byrd Farms knew of Plaintiffs' interest in the property, "their failure to record the deed prior to Byrd Farms filing the deed would have defeated their right to the property." Further, Defendant Byrd Farms argued it was not liable for any imposition of resulting or constructive trusts because the "complaint fails to allege any fraud or other wrongdoing by [Defendant] Byrd Farms against the Plaintiffs."

Defendants Monsivais, and Defendant Humberto individually, failed to file an answer to Plaintiffs' complaint, and the trial court entered an order of default judgment on 31 August 2023 against Defendants Monsivais.

On 9 October 2023, the trial court held a hearing on Defendant Byrd Farms' motion to dismiss and subsequently entered an order on 24 December 2023 denying the motion. Defendant Byrd Farms then filed an answer and cross-claims against

---

[2] Defendant DMV filed an answer, explaining it lacked knowledge of the matter and "has no vested interest in the outcome of this case."

Plaintiffs on 18 December 2023, and the parties proceeded to discovery.

Several months later, on 10 June 2024, Defendant Byrd Farms filed a motion for summary judgment, contending "there is no genuine issue as to any material facts" and that it was "entitled to judgment as a matter of law." Plaintiffs then filed their own motion for partial summary judgment on 20 June 2024.

These summary judgment motions came on for hearing before the trial court. After the hearing, the trial court entered an order on 10 December 2024 granting summary judgment (the "Summary Judgment Order") in favor of Defendant Byrd Farms, concluding "there is no genuine issue as to any material fact[.]"

On 3 February 2025, Plaintiffs filed a motion for default judgment against Defendants Monsivais, requesting the trial court rule in favor of Plaintiffs regarding their previous claims brought against Defendants Monsivais together and claims against Defendant Humberto individually, and dismissing the relief claims of trusts against Defendant Humberto, and the declaratory and quiet titles claims against all Defendants for procedural reasons in order to later appeal the Summary Judgment Order. On 11 March 2025, the trial court entered an order granting Plaintiffs' motion for default judgment and awarding Plaintiffs monetary damages against Defendants Monsivais, together and individually (the "Default Judgment Order"). The trial court provided damages, in relevant part:

> 1. $84,826.00 from Defaulted [Defendants Monsivais], jointly and severally, to [P]laintiffs Angelica Lopez Figueroa and Jediael Ventura Santiago, jointly, for

compensatory damages, plus interest at the rate of 8% per annum from the time of commencement of this action until the judgment is satisfied;

2. $75,000.00 from [D]efendant Humberto Monsivais II to [P]laintiff Angelica Lopez Figueroa for compensatory emotional distress damages, plus interest at the rate of 8% per annum from the time of commencement of this action until the judgment is satisfied;

3. $75,000.00 from [D]efendant Humberto Monsivais II to Jediael Ventura Santiago for compensatory emotional distress damages, plus interest at the rate of 8% per annum from the time of commencement of this action until the judgment is satisfied;

. . . .

5. $32,050.00 from [D]efendant Humberto Monsivais II to [P]laintiff Albertano Lopez for compensatory damages, plus interest at the rate of 8% per annum from the time of commencement of this action until the judgment is satisfied;

6. $50,000.00 from [D]efendant Humberto Monsivais II to Albertano Lopez for compensatory emotional distress damages, plus interest at the rate of 8% per annum from the time of commencement of this action until the judgment is satisfied[.]

On 14 March 2025, Plaintiffs voluntarily dismissed their claims against Defendant DMV in order to appeal their other claims. On 27 March 2025, Plaintiffs filed a notice appeal, appealing from the Summary Judgment Order and the Default Judgment Order.

## II. **Jurisdiction**

This Court has jurisdiction to review this appeal from a final judgment of a

superior court pursuant to N.C.G.S. § 7A-27(b) (2023).

### III. <u>Standard of Review</u>

"The standard of review for summary judgment is de novo." *Forbis v. Neal*, 361 N.C. 519, 524 (2007). "Summary judgment is appropriate when no genuine issue of material fact exists, and a party is entitled to judgment as a matter of law." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 267 (2023). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re S.W.*, 298 N.C. App. 39, 44 (2025) (citation modified). "When reviewing a grant of summary judgment evidence presented by the parties must be viewed in the light most favorable to the non-movant." *Est. of Joyner v. Joyner*, 231 N.C. App. 554, 556 (2014) (citation and internal quotation marks omitted).

Furthermore, "[a]s a general rule, this Court reviews an entry of default judgment for abuse of discretion." *Webb v. McJas, Inc.*, 228 N.C. App. 129, 133 (2013) (citation omitted). "An abuse of discretion is a decision manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *Venters v. Albritton*, 184 N.C. App. 230, 234 (2007) (citation omitted).

### IV. <u>Analysis</u>

On appeal from the Summary Judgment and Default Judgment Orders, Plaintiffs argue the trial court erred by failing to (A) grant Plaintiffs a constructive trust, (B) grant Plaintiffs a resulting trust, (C) quiet title to the real property in

Plaintiffs' names, (D) enter declaratory judgment in Plaintiffs' favor, and (E) quiet title to the mobile homes in Plaintiffs' names.

## A. Constructive Trust

Plaintiffs first argue the trial court erred by failing to grant Plaintiffs a constructive trust. Specifically, Plaintiffs contend (1) "a constructive trust arose because of [Defendants Monsivais'] wrongful conduct"; and (2), "a constructive trust arose when [Defendant] Byrd Farms itself breached a duty to Plaintiffs and obtained the property under inequitable circumstances."

A constructive trust "is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing." *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211 (1970). "[A] constructive trust is a remedy, not a cause of action, and is merely a procedural device by which a court of equity may rectify certain wrongs." *Musselwhite,* 266 N.C. App. at 181 (citation and internal quotation marks omitted).

Our Supreme Court has explained a constructive trust is

> a duty, or relationship, imposed by courts *of equity* to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530 (2012) (citation omitted) (emphasis added). "Fraud need not be shown if legal title

- 10 -

has been obtained in violation of some duty owed to the one equitably entitled." *Roper v. Edwards*, 323 N.C. 461, 465 (1988).

A constructive trust "may be imposed against anyone who 'in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.'" *Myers v. Myers*, 213 N.C. App. 171, 180 (2011) (quoting *Electric Co. v. Construction Co.,* 267 N.C. 714, 719 (1966)). Thus, a trial court may impose a constructive trust,

> even in the absence of fraud or a breach of fiduciary duty, upon the showing of either (1) some other circumstance making it inequitable for the defendant to retain the funds against the claim of the beneficiary of the constructive trust, or (2) that the defendant acquired the funds in an unconscientious manner.

*Houston v. Tillman*, 234 N.C. App. 691, 697 (2014) (citing *Variety Wholesalers, Inc.*, 365 N.C. at 530–31). "On the whole . . . the constructive trust is seen by American courts today as a remedial device, to be used *wherever specific restitution in equity is appropriate on the facts.*" *Roper*, 323 N.C. at 465 (emphasis in original).

Because imposing a constructive trust is a remedial device, we review the trial court's decision on whether to impose a constructive trust for an abuse of discretion. *See Kinlaw v. Harris*, 364 N.C. 528, 533 (2010) ("Because the fashioning of equitable remedies is a discretionary matter for the trial court, we review such actions under an abuse of discretion standard."). "Trial courts have broad discretion to fashion equitable remedies to protect innocent parties when injustice would otherwise

result." *Id.* at 532.

### 1. Defendants Monsivais

Plaintiffs first argue that a constructive trust should have been granted where Defendants Monsivais committed fraud and breach of contract. Plaintiffs contend that, where Defendants Monsivais have admitted to fraud and breach of contract by failing to answer, Defendant Humberto held title to property he should not have, thus "giving rise to a constructive trust by operation of law while [Defendant Humberto] Monsivais was still title owner."

In contending that a constructive trust arose by operation of law while Defendants Monsivais still held title, Plaintiffs cite *Myers*. In *Myers*, the decedent had two sons, Jerry and Tommy, from a previous marriage, and subsequently had a third son, Travis, from a second marriage. 213 N.C. App.at 172. After the decedent and his second wife divorced, the trial court entered a consent order, which included a provision that "[Travis] be listed as a beneficiary of less than thirty-three percent (33%) of any death benefits of [the decedent] through his employment." *Id.* at 173. When the decedent died, his life insurance benefits through his employment went to Jerry and Tommy, and Travis received none of the proceeds. *Id.* at 173. Travis's mother brought suit against Jerry and Tommy, and the trial court imposed a constructive trust against them for Travis. *Id.* at 174. On appeal, we upheld the trial court's equitable decision to impose a constructive trust, explaining that

> [the d]ecedent's failure to list Travis as a beneficiary under

> the plans, as required by the [] consent order, was inequitable conduct which has unjustly enriched Jerry and Tommy. Because Jerry and Tommy are in possession of Travis'[s] share of the death benefits as a result of [the d]ecedent's inequitable failure to comply with the [] consent order, the trial court did not err in imposing a constructive trust in this case.

*Id.* at 180.

*Myers*, however, did not involve conveyances of real property or contracts regarding real property, nor did *Myers* establish a constructive trust by an operation of law rather than equity; instead, *Myers* was a discussion on affirming the trial court's discretionary decision to impose a constructive trust as an equitable remedy. Here, Plaintiffs have not argued how the trial court's actions of awarding Plaintiffs monetary damages against Defendants Monsivais—over imposing a constructive trust—was an abuse of discretion. *See Kinlaw*, 364 N.C. at 532. Thus, the trial court properly exercised its discretion in granting monetary damages over imposing a constructive trust against Defendant Humberto in the Default Judgment Order. *See id.*

### *2. Defendant Byrd Farms*

Plaintiffs next argue the trial court should have imposed a constructive trust against Defendant Byrd Farms "due to the manner in which Defendant Byrd Farms obtained the property." Defendant Byrd Farms, however, has claimed the protection of our state's recording statute, alleging the defense of N.C.G.S. § 47-18 in its answer, and thus, a constructive trust is not applicable.

"To remedy the evil of uncertainty of land titles, in 1885 the North Carolina General Assembly passed the Connor Act, now codified as [N.C.]G.S. [§] 47-18." *Stephenson v. Jones*, 69 N.C. App. 116, 123 (1984). The Connor Act provides:

> No (i) conveyance of land, (ii) contract to convey, (iii) option to purchase or convey, . . . is valid to pass any property interest as against lien creditors or purchasers for a valuable consideration from the donor, bargainor, or lessor *but from the time of its registration* in the county where the land lies . . . .

N.C.G.S. § 47-18(a) (2023) (emphasis added). "[T]his law does not favor persons withholding from the public record deeds or contracts to convey or reconvey lands, particularly when third parties have given valuable consideration for same." *Stephenson,* 69 N.C. App. at 123 (citation modified). We have explained:

> While most jurisdictions have a form of recordation statute which protects *subsequent* grantees from prior conveyances only if they have paid value and purchased without actual notice of a prior unrecorded conveyance, the recordation statute in effect in North Carolina protects *any* purchaser for value of specific land who records first, whether he has notice of a prior unrecorded conveyance or not, and irrespective of whether he is a prior or subsequent purchaser. . . . This concept is frequently expressed in the following manner: "No notice, however full or formal, will supply the want of registration of a deed." Thus[,] in North Carolina, if a grantor conveys real property to A and later conveys the same interest to B for a valuable consideration, and B records first, [B] will have the superior right in the real property even though B had actual notice of the prior conveyance. Although the grantor has conveyed good title to A and has no further title to convey, the grantor retains a *power* to defeat his earlier conveyance, if it is not recorded, by another conveyance to a second grantee.

. . . .

> Thus[,] it is all important for a grantee to immediately record any deed which he receives in order to protect himself against prior or subsequent purchasers from the same grantor with respect to the land granted.

*Schiller v. Scott*, 82 N.C. App. 90, 92–93 (1986) (quoting Webster, *Real Estate Law in North Carolina* Sec. 370 at 402–03 (Rev.Ed.1981)) (emphasis in original).

While *Schiller* indicates protection for *any* purchaser for value of specific land who records first, *Hill* clarifies that *any* does not mean *all*, stating "[o]ur registration statute does not protect all purchasers, but only innocent purchasers for value." *Hill v. Pinelawn Mem'l Park, Inc.*, 304 N.C. 159, 165 (1981). "[The statute] is objective in its character and does not attempt to settle any equities which might exist between a grantor and those to whom he has sold his land, and those to whom he has resold it either mistakenly or deliberately and fraudulently." *Patterson v. Bryant*, 216 N.C. 550, 551 (1939). Further, as here, "[a]n unrecorded contract to convey land is not valid as against a subsequent purchaser for *value*, for those holding under such a purchaser, even though he acquired title with actual notice of the contract." *Beasley v. Wilson*, 267 N.C. 95, 97 (1966) (emphasis added); *see also Hood v. Macclesfield Co.*, 209 N.C. 280, 280 (1936) ("Even if the conveyance had been executed, it would not be valid as against creditors and purchasers for value but from the registration thereof within the county where the land lies." (citation and internal quotation marks omitted)).

We have explained that, "where a purchaser claims protection under our registration laws, he has the burden of proving by a preponderance of the evidence that he is an innocent purchaser for value, i.e., that he [1] paid valuable consideration" and "that he [2] had no actual notice[] or constructive notice . . . of *pending litigation* affecting title to the property[,]" *Stephenson*, 69 N.C. App. at 124 (emphasis added), while notice of unrecorded deeds and contracts to convey do not prevent the protection of our recording statute, *see, e.g. Beasley*, 267 N.C. at 97; *see also Hill*, 304 N.C. at 165–66 (holding the defendants were not innocent purchasers where there was a pending lawsuit over the title to the property in dispute and "they were parties to the action themselves").

Thus, we first examine whether Mr. Byrd on behalf of Defendant Byrd Farms paid valuable consideration. "A 'purchaser for value' or a 'purchaser for valuable consideration' is defined by our case law simply as one who has paid a valuable consideration for the execution of an instrument of conveyance." *Rowe v. Walker*, 114 N.C. App. 36, 39 (1994), *aff'd*, 340 N.C. 107 (1995). "Valuable consideration or 'value' is a *fair* consideration, not necessarily up to full value, but a price paid which would not cause surprise. The burden of proof of the 'innocent purchaser' issue is upon those claiming the benefit of this principle[.]" *Morehead v. Harris*, 262 N.C. 330, 338 (1964) (internal citation omitted)(emphasis added); *see also Worthy v. Caddell*, 76 N.C. 82, 86 (1877) ("[T]he party assuming to be a purchaser for valuable consideration, must prove a fair consideration, not up to the full value, but a price paid which would not

cause surprise, or make any one exclaim, 'he got the land for nothing, there must have been some fraud or contrivance about it.'").

Our Supreme Court has explained that

> it is the materiality of the irregularity in such a sale, not mere inadequacy of the purchase price, which is determinative of a decision in equity to set the sale aside. Where an irregularity is first alleged, gross inadequacy of purchase price may then be considered on the question of the materiality of the irregularity. Where inadequacy of purchase price is necessary to establish the materiality of the irregularity, it must also appear that the irregularity or unusual circumstance caused the inadequacy of price.

*Swindell v. Overton*, 310 N.C. 707, 713–15 (1984) (internal citations omitted) (holding that the "purchasers had notice of the significant defect in the proceeding" where "[t]he advertisement of sale itself disclosed separate debts secured by two separate deeds of trust on two separate tracts of land").

Thus, "[o]ne who for value purchases the record title without notice actual or constructive of any equity or adverse claim therein is protected[,]" *Ricks v. Batchelor*, 225 N.C. 8, 12 (1945), and "[u]ntil the contract or conveyance is recorded, third parties may deal with the property as if no contract or conveyance existed[,]" *Hayes v. Ricard*, 245 N.C. 687, 692 (1957); *see also Simmons v. Quick-Stop Food Mart, Inc.*, 307 N.C. 33, 42 (1982) ("[O]nly actual prior recordation of an interest in land will serve to put a bona fide purchaser for value or a lien creditor on notice of an intervening interest or encumbrance on real property.").

Here, Mr. Byrd explained in his deposition that the "sales contract price

dropped from what we agreed upon and it went down and it was because [Defendant Humberto] wanted some money up front and I'm like, you know, if that's what you want to do, I'll do it because it's ultimately going be good for me." According to Mr. Byrd, "[Defendant Humberto] was so desperate to just make ends meet at that period of time in his life where his wife had kicked him out and he didn't have his clothes. He didn't have his billfold. . . . He said, I hadn't eaten anything in two days[.] . . . I can't even buy a cheeseburger because I have nothing." Mr. Byrd explained that Defendant Humberto said he would "knock $2,000" off regarding the purchase price for a lesser amount of money up front.

When asked what the ultimate purchase price ended up being, Mr. Byrd answered, "I don't even know what the total was but it wasn't 15 [thousand.]" Then, when asked if the price was fair, he responded, "I can't answer you. I can't answer that because I don't even know what it is that I own and I've had to price a question mark. So, there's no way – there's no way to fairly answer that question because I don't know what I'm pricing." The deposition continued:

> Q. So it would have been, at the maximum, $13,560 when you add all four of those checks and payments together.
>
> A. That's somewhat – that's going to be close to being right because it was – when we agreed to the 15 on that sales contract, the 15.5, that's still with him supposing to bring the titles to the mobile home. So when it all shook out, it should have been less because he brought less. Even though he had a bill of sale, a bill of sale to me is worth less than the title.

Mr. Byrd explained that he was unsure if the property he bought representing Defendant Byrd Farms included the mobile homes on it, and Mr. Byrd put forth no evidence regarding the value of the mobile homes which, perhaps, were included in the sale. Furthermore, Mr. Byrd admitted that, although it was reported to Sampson County that he paid $22,500.00 for the real property via his excise tax, he did not pay that amount.

Viewing the evidence in the light most favorable to Plaintiffs, *see Joyner*, 231 N.C. App. at 556, there is a genuine issue of fact as to what the amount of consideration was for (i.e. the real property or the mobile homes)—where Mr. Byrd himself did not know the amount of what it was for—let alone whether the amount constituted fair consideration. We therefore cannot assess whether Defendant Byrd Farms was an innocent purchaser for value such that it would receive protection under our recording statute. *See Stephenson*, 69 N.C. App. at 124. Accordingly, we reverse the trial court's granting of Defendant Byrd Farms' motion for summary judgment and remand for proceedings to determine what Defendant Byrd Farms paid for the real property and whether he paid fair consideration. Because we reverse and remand for further proceedings, we do not address Plaintiffs' additional arguments. Furthermore, we deny Defendant Byrd Farm's motion for sanctions as a frivolous appeal against Plaintiff.

## V. <u>Conclusion</u>

Upon careful review, we affirm the trial court's Default Judgment Order, but

we conclude the trial court erroneously granted summary judgment because there is a genuine issue of material fact as to whether Defendant Byrd Farms paid fair consideration. Therefore, we reverse and remand the trial court's granting of summary judgment in favor of Defendant Byrd Farms.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

Chief Judge DILLON and Judge FREEMAN concur.